GHANAM v JOHN DOES

Docket No. 312201. Submitted January 8, 2013, at Detroit. Decided January 2, 2014, at 9:05 a.m. Leave to appeal sought.

Gus Ghanam, deputy superintendent of the department of public works for the city of Warren, brought an action in the Macomb Circuit Court against several unknown defendants, alleging defamation per se based on statements about plaintiff posted on an Internet message board called The Warren Forum. Plaintiff sought an ex parte order to depose Joseph Munem, whom plaintiff believed was affiliated with The Warren Forum, seeking to determine the identity of the individuals who posted the allegedly defamatory statements. The court, John C. Foster, J., granted the request and issued an order permitting plaintiff to depose Munem. Munem moved for a protective order, which the court denied. The Court of Appeals granted Munem's interlocutory application for leave to appeal.

The Court of Appeals *held*:

1. The right to freedom of speech includes the right to publish and distribute writings while remaining anonymous, but the right to anonymous expression does not extend to defamatory expression. The basic elements of defamation are (1) a false and defamatory statement concerning the plaintiff, (2) an unprivileged communication to a third party, (3) fault amounting at least to negligence on the part of the publisher, and (4) either actionability of the statement irrespective of special harm (defamation per se) or the existence of special harm caused by publication. With regard to the defendant's fault, if the plaintiff is a public figure, the plaintiff must prove that the statement was made with actual malice. Michigan's rules of civil procedure adequately protect a defendant's interests in anonymous speech when that defendant is aware of and involved in a pending defamation lawsuit. However, when a plaintiff seeks disclosure of the identity of an anonymous defendant who might not be aware of the pending defamation lawsuit, the plaintiff is first required to make reasonable efforts to notify the defendant of the lawsuit, and, in addition, the trial court is required to analyze the complaint under MCR 2.116(C)(8) to ensure that the plaintiff has stated a claim on which relief can be

granted. In this case, plaintiff failed to make reasonable attempts to inform the anonymous defendants of the lawsuit and his efforts to discover their identities. Further, plaintiff's claims were facially deficient given that plaintiff failed to specify the allegedly defamatory statements in his complaint. Accordingly, defendants were entitled to summary disposition, and it was improper for the trial court to issue an order permitting plaintiff to depose Munem.

2. Under MCR 2.116(I)(5), if summary disposition is appropriate under MCR 2.116(C)(8), a plaintiff must be given the opportunity to amend his or her pleadings unless amendment would be futile. Accusations of criminal activity are considered defamation per se and do not require proof of damage to the plaintiff's reputation. However, not all statements that could be read as accusations of a crime or misconduct should be considered assertions of fact. If a reasonable reader would understand the statements as mere rhetorical hyperbole meant to express strong disapproval rather than as an accusation of criminal activity, the statements cannot be regarded as defamatory. The context and forum in which the statements appear affects whether a reasonable reader would interpret the statements as asserting provable facts. Read in context, the statements at issue in this case could not be regarded as assertions of fact. Instead, the statements—which were sarcastic in tone, posted on an Internet message board, concerned facts that were already public knowledge, and involved far-fetched allegations—were rhetorical hyperbole and not defamatory as a matter of law. Therefore, permitting plaintiff to amend his complaint would have been futile.

Reversed and remanded for entry of judgment in favor of defendants.

STEPHENS, J., concurring, wrote separately to address with specificity her belief that Michigan should adopt the analysis of the Delaware Supreme Court in *Doe v Cahill*, 884 A2d 451 (Del, 2005). That Court held that while a plaintiff who is a public figure needs to prove actual malice to prevail on a defamation claim, proving malice when the identity of the defendant is unknown is unduly burdensome and, therefore, the plaintiff need not plead facts in support of the element of actual malice in order to ascertain the identity of the person or persons who authored the defamatory statements.

1. ACTIONS — DEFAMATION — ANONYMOUS DEFENDANTS.

When a defamation plaintiff seeks disclosure of the identity of an anonymous defendant who might not be aware of the pending defamation lawsuit, the plaintiff is first required to make reason-

able efforts to notify the defendant of the lawsuit, and, in addition, the trial court is required to analyze the complaint under MCR 2.116(C)(8) to ensure that the plaintiff has stated a claim on which relief can be granted.

2. ACTIONS — DEFAMATION — ACCUSATIONS OF CRIMINAL ACTIVITY — RHETORICAL HYPERBOLE.

In analyzing a claim of defamation, not all statements that might be read as accusations of a crime or misconduct should be considered assertions of fact; if a reasonable reader would understand the statements as mere rhetorical hyperbole meant to express strong disapproval rather than as an accusation of criminal activity, the statements cannot be regarded as defamatory; the context and forum in which the statements appear affects whether a reasonable reader would interpret the statements as asserting provable facts.

*Boyle Burdett* (by *Eugene H. Boyle, Jr.,* and *H. William Burdett, Jr.*) for Joseph Munem.

*York, Dolan & Tomlinson, PC* (by *John A. Dolan*), for Gus Ghanam.

Before: TALBOT, P.J., and WILDER and STEPHENS, JJ.

WILDER, J. Appellant, Joseph Munem, appeals by leave granted from the circuit court's order denying his motion for a protective order barring discovery. Plaintiff seeks to depose Munem to discover the identities of persons who allegedly made defamatory statements about him on an Internet message board. Munem seeks to keep the identities of those people anonymous. We reverse and remand for the trial court to enter judgment in favor of defendants.

I

Plaintiff is the deputy superintendent of the department of public works for the city of Warren. He filed a complaint alleging a single count of defamation per se

against several unknown "John Doe" defendants. Ac-
cording to the complaint, defendants posted false and
malicious statements about plaintiff on an Internet
message board called The Warren Forum. Defendants
posted these statements anonymously under fictitious
user names. Plaintiff's complaint did not provide the
specific text of those statements but alleged that they
"prejudiced and caused harm to the Plaintiff in his
reputation and office and held Plaintiff up to disgrace,
ridicule, and contempt." Plaintiff alleged that the state-
ments were false, not privileged, and "were made with
the knowledge that they were false, or with reckless
disregard for their falsity." Plaintiff maintains that the
anonymous statements accused him of being involved
in the disappearance and theft of approximately 3,647
tons of road salt from city storage facilities and of
stealing tires from city garbage trucks and selling
them. Plaintiff finally presented a verbatim text of
the alleged defamatory statements in his response to
Munem's motion for a protective order. The state-
ments at issue were posted to The Warren Forum
message board in January and February 2012 by
people using the pseudonyms "northend," "yogi,"
"hatersrlosers," and "pstigerfan."

The first set of statements at issue concerned reports
that 3,647 tons of rock salt was missing from the city's
storage dome and that nobody could account for how it
had disappeared. The local news media reported on the
missing road salt after an audit revealed a discrepancy
between the city's inventory and records.[1] The state-
ments were replies posted to a topic thread titled,

_____

[1] The audit that brought the salt shortage to light was part of the
yearly audit conducted for the city. The audit was for the fiscal year
ending June 30, 2011, and the report was issued on December 16, 2011.
In the report, the auditor noted that there was a discrepancy of 3,647 tons
of salt ($178,725 value) between the inventory and the city's records. The

"Where did our road salt go?" Northend commented as follows[2] on the road salt thread:

> I wouldn't be surprised if the salt is close to city hall and the storage area for the city. IMO[3] the salt is somewhere around the sports complex on Van Dyke, just south of 14 mile, where Gus hangs out and drinks most days, or at least the days I am in there hitting golf balls. Hmm maybe I need to call the investigators?

Yogi commented on the road salt thread that "the pizza box maker sold it! him an Gus probably split the money."

The second set of statements at issue were replies to an initial posting titled "MORE sanitation trucks? Yep," which concerned the city's decision to buy additional new garbage trucks. The city's decision to buy additional new garbage trucks was controversial and reported in the local news media because it came after the city had denied other city departments' requests for new equipment. Haterslosers commented that the city was "only getting more garbage trucks because Gus needs more tires to sell to get more money for his pockets :P"[4] And pstigerfan stated, in relevant part, as follows:

---

report also made recommendations for the city to implement so that it could "minimize the misappropriation of the inventory" in the future.

[2] The comments are quoted verbatim with all spelling and grammatical errors.

[3] The Internet is rife with shorthand acronyms and symbols to represent longer words or phrases. IMO means "in my opinion."

[4] The colon followed by capital P appears in the original and is an emoticon. An "emoticon" is an icon formed by grouping keyboard characters together into a representation of a facial expression. Emoticons are used to suggest an attitude or emotion in computerized communications. See *Random House Webster's College Dictionary* (2003). A ":P" emoticon represents a face with a tongue sticking out, indicating a joke, sarcasm, or disgust.

Since Warren is the only community in Macomb County to have city employees pick up trash, then [Mayor James] Fouts must have a better idea of what is going on compared to the other communities. Oh wait, his buddies Gus and Dick[5] run the department, and in turn make money off of it (selling tires, selling road salt, etc). If we didn't have a Sanitation Department with new trucks (and old tires), then Gus would have to take tires off of other vehicles in other departments in order to make his money.

Plaintiff filed a petition for an ex parte order to depose Munem, a former city employee, to determine the identity of the anonymous John Does who left the allegedly defamatory statements on The Warren Forum. In light of past conversations with Munem, plaintiff believed that Munem was affiliated with the website. The circuit court granted plaintiff's petition and issued an order permitting plaintiff to depose Munem "for the purpose of identifying ownership of the Warren Forum and bloggers on the Warren Forum website who have made entries relating to Plaintiff, Gus Ghanam."

Munem then moved for a protective order against his deposition, arguing that the First Amendment protects a critic's right to anonymously comment about the actions of a public official and that the identities of the anonymous writers were subject to a qualified privilege. Munem argued that before plaintiff could seek to compel the identification of the anonymous posters, he must produce sufficient evidence supporting each element of a cause of action for defamation against a public figure. The circuit court did not consider or acknowledge the First Amendment aspects involved and, instead, merely relied on the open and liberal discovery rules of Michigan. The trial court provided the following explanation from the bench:

---

[5] We presume this is a reference to Richard Sabaugh, Director of Warren's Public Service Department.

Well, I'm of the opinion that this lawsuit alleges certain things that, if proven, are compensable. If proven. They have to be proven.

The second step is in litigation we have a whole process that involves discovery and many aspects of it and, indeed, liberal discovery in Michigan. I believe also, from looking at the cases that you both cited, that the trend on this, as well as in any of the other areas of law, is more towards transparency, not hiding things in this country. The more we hide, the less we have democracy, the less we have freedom, the less we have opportunity for people to succeed and to move forward. It would be a terrible thing on both sides to stop speech, but it would also say to people don't ever take a public job because on anonymous forums they can lie about whether you are a thief or not and accuse you of crimes and things of outrageous behavior. So both those things have to be weighed, one against the other.

We are at the discovery phase in this matter and, as I said, I believe the trend is to open things up. The ownership with forums, the knowledge of the ownership of the forum and the names of the posters doesn't subject them to any liability whatsoever of any sort. Simply, they are a part of the process for the courts to determine whether there is an appropriate cause of action involved in the matter. And so, I believe that the factors that have to be shown are laid out, as you both stated in the Michigan Supreme Court case of [*Smith v Anonymous Joint Enterprise*, 487 Mich 102; 793 NW2d 533 (2010)]. Discovery here is clearly intended to lead to admissible evidence or the ability to obtain admissible evidence and is, therefore, acceptable at this stage of the process. So Mr. Munem will be subject to plaintiff's discovery methods. Thank you.

II

Munem raises three main arguments on appeal. First, he argues that Michigan courts must require some showing of merit to the defamation action before the court will allow a plaintiff to conduct discovery

regarding the identity of an anonymous critic. Munem urges this Court to adopt the standards articulated in *Dendrite Int'l, Inc v Doe No 3*, 342 NJ Super 134; 775 A2d 756 (App Div, 2001). Second, Munem argues that since plaintiff made no showing that complied with *Dendrite*, he should be barred from using discovery methods to obtain the identity of the anonymous defendants. Third, Munem argues that the statements at issue that were posted on The Warren Forum are nothing more than rhetorical hyperbole that cannot provide the basis for a defamation action.

We agree with Munem that the use of the discovery process by public officials seeking to identify anonymous Internet critics raises First Amendment concerns about the use of defamation actions to identify current critics and discourage others from exercising their rights to free speech. In *Thomas M Cooley Law Sch v Doe 1*, 300 Mich App 245, 266-267; 833 NW2d 331 (2013), another panel of this Court held that the Michigan rules of civil procedure adequately protect a defendant's interests in anonymous speech when that defendant is aware of and involved in a pending defamation lawsuit. The *Cooley* Court declined, however, to address what it described as the extreme case—one in which the plaintiff in a defamation case sues an anonymous defendant solely to subpoena the defendant's Internet provider for identifying information in order to retaliate against the defendant in some fashion outside the court action. *Id*. at 269-271. While acknowledging that *Dendrite* and *Doe v Cahill*, 884 A2d 451, 457 (Del, 2005), offer protection to anonymous defendants in this category that the Michigan rules of civil procedure do not, the *Cooley* Court declined to adopt the *Dendrite* standard or any other similar standard because it was not necessary under the facts of that case. See *Cooley*, 300 Mich App at 270 (declining to extend its holding

"beyond the facts" that were before the Court, which included the facts that the anonymous defendant knew "relatively early on" that there was a pending defamation lawsuit and that, through his actions, he had been successful in preventing a public disclosure of his name).

In the instant case, however, there is no evidence that any of the anonymous defendants were aware of the pending matter or involved in any aspect of the legal proceedings. Therefore, the instant case is distinguishable from *Cooley*, and while its analysis is applicable here, *Cooley's* holding is not controlling of the outcome in this case. We hold that when a plaintiff seeks disclosure of the identity of an anonymous defendant who might not be aware of the pending defamation lawsuit, the plaintiff is first required to make reasonable efforts to notify the defendant of the lawsuit, and, in addition, the trial court is required to analyze the complaint under MCR 2.116(C)(8) to ensure that the plaintiff has stated a claim on which relief can be granted. Applying these requirements to the facts in the instant case, we reverse the trial court's ruling denying Munem's request for a protective order and further hold that defendants are entitled to judgment as a matter of law because the statements at issue were not defamatory.

A

A trial court's decision on whether to compel discovery is ordinarily reviewed for an abuse of discretion. *Cabrera v Ekema*, 265 Mich App 402, 406; 695 NW2d 78 (2005). However, because of the importance of protecting the right to freedom of expression under the First Amendment, in cases in which public officials or public figures sue for defamation, courts must conduct an independent review of the record and "analyze the

alleged defamatory statements at issue and their sur-
rounding circumstances to determine whether those
statements are protected under the First Amendment."
*Smith*, 487 Mich at 111-112.

The First Amendment provides strong protections to
those who use their freedom of speech to criticize public
officials over public issues. "At the heart of the First
Amendment is the recognition of the fundamental
importance of the free flow of ideas and opinions on
matters of public interest and concern." *Hustler Maga-
zine, Inc v Falwell*, 485 US 46, 50; 108 S Ct 876; 99 L Ed
2d 41 (1988). The United States Supreme Court ex-
plained:

> The sort of robust political debate encouraged by the
> First Amendment is bound to produce speech that is
> critical of those who hold public office . . . . "[O]ne of the
> prerogatives of American citizenship is the right to criticize
> public men and measures." Such criticism, inevitably, will
> not always be reasoned or moderate; public figures as well
> as public officials will be subject to "vehement, caustic, and
> sometimes unpleasantly sharp attacks[.]" "[T]he candidate
> who vaunts his spotless record and sterling integrity can-
> not convincingly cry 'Foul!' when an opponent or an
> industrious reporter attempts to demonstrate the con-
> trary." [*Id.* at 51-52 (citations omitted; third alteration in
> original).]

Given the need to protect uninhibited, robust, and
wide-open debate, the law recognizes that freedom of
expression requires "breathing space," which "is pro-
vided by a constitutional rule that allows public figures
to recover for libel or defamation only when they can
prove *both* that the statement was false and that the
statement was made with the requisite level of culpa-
bility." *Id.* at 52. And the requisite level of culpability a
plaintiff who is a public official must prove is that the
false statements were made "with actual malice." *New*

*York Times Co v Sullivan*, 376 US 254, 279-280; 84 S Ct 710; 11 L Ed 2d 686 (1964); *Smith*, 487 Mich at 114-115. "Actual malice" does not require a showing of ill will, but instead "exists when the defendant knowingly makes a false statement or makes a false statement in reckless disregard of the truth." *Smith*, 487 Mich at 114, citing *New York Times*, 376 US at 280. Similarly, reckless disregard does not mean that the speaker merely failed to act with reasonably prudent conduct, but instead requires "sufficient evidence to justify a conclusion that the defendant made the allegedly defamatory publication with a 'high degree of awareness' of the publication's probable falsity, or that the defendant 'entertained serious doubts as to the truth' of the publication made." *Smith*, 487 Mich at 116 (citations omitted). This requirement is codified in Michigan by MCL 600.2911(6):

> An action for libel or slander shall not be brought based upon a communication involving public officials or public figures unless the claim is sustained by clear and convincing proof that the defamatory falsehood was published with knowledge that it was false or with reckless disregard of whether or not it was false.

Without the actual malice requirement, "would-be critics of official conduct may be deterred from voicing their criticism, even though it is believed to be true and even though it is in fact true, because of doubt whether it can be proved in court or fear of the expense of having to do so." *New York Times*, 376 US at 279. Whether the statements are defamatory and whether the evidence presented is sufficient to show actual malice on the part of the defendant present questions of law to be decided by the courts. *Smith*, 487 Mich at 111. When a plaintiff who is a public official cannot show actual malice by clear and convincing evidence, the defendant is entitled

to summary disposition of the defamation claim. *Ireland v Edwards*, 230 Mich App 607, 622-624; 584 NW2d 632 (1998).

Further, the United States Supreme Court has recognized that a writer's First Amendment right to freedom of speech includes the right to publish and distribute writings while remaining anonymous. *McIntyre v Ohio Elections Comm*, 514 US 334, 342; 115 S Ct 1511; 131 L Ed 2d 426 (1995); *Talley v California*, 362 US 60, 64-65; 80 S Ct 536; 4 L Ed 2d 559 (1960).

> [T]he interest in having anonymous works enter the marketplace of ideas unquestionably outweighs any public interest in requiring disclosure as a condition of entry. Accordingly, an author's decision to remain anonymous, like other decisions concerning omissions or additions to the content of a publication, is an aspect of the freedom of speech protected by the First Amendment. [*McIntyre*, 514 US at 342.]

Because of the interest in protecting freedom of expression, "there are times and circumstances when States may not compel members of groups engaged in the dissemination of ideas to be publicly identified." *Talley*, 362 US at 65. This right to speak anonymously applies to those expressing views on the Internet. *SaleHoo Group, Ltd v ABC Co*, 722 F Supp 2d 1210, 1213 (WD Wash, 2010). " 'Internet anonymity facilitates the rich, diverse, and far ranging exchange of ideas,' and individuals 'who have committed no wrongdoing should be free to participate in online forums without fear that their identity will be exposed under the authority of the court.' " *Id.* at 1213-1214, quoting *Doe v 2TheMart.com Inc*, 140 F Supp 2d 1088, 1092 (WD Wash, 2001). However, the right to anonymous speech is not absolute; the First Amendment protects the right to speak rather than the right to remain anonymous or to avoid

the consequences of one's statements. *Doe v Reed*, 561 US 186, ___; 130 S Ct 2811, 2831 n 4; 177 L Ed 2d 493 (2010) (Stevens, J., concurring in part). The right to anonymous expression over the Internet does not extend to defamatory speech, which is not protected by the First Amendment. *SaleHoo Group*, 722 F Supp 2d at 1214.

B

In order to balance these competing interests, there is an entire spectrum of "standards" that courts have used when they are faced with a plaintiff who is a public figure seeking to identify an anonymous defendant who has posted allegedly defamatory material regarding the plaintiff. These standards, ranging from least stringent to most stringent, include a good-faith basis to assert a claim, pleading sufficient facts to survive a motion to dismiss, showing of prima facie evidence sufficient to withstand a motion for summary disposition, and "hurdles even more stringent." *Cahill*, 884 A2d at 457.

Munem urges this Court to adopt the approach from *Dendrite*, in which the court required, *inter alia*, that a plaintiff show evidence sufficient to withstand "summary judgment" before forcing the identification of anonymous posters. In *Dendrite*, the plaintiff sued anonymous defendants for postings on an Internet message board. The plaintiff sought to compel the Internet service provider (ISP) to disclose the defendants' identities, and the defendants moved to bar the discovery. The court noted that it needed a procedure to ensure that plaintiffs "do not use discovery procedures to ascertain the identities of unknown defendants in order to harass, intimidate or silence critics in the public forum opportunities presented by the Internet." *Dendrite*, 342 NJ Super at 156.

The *Dendrite* court held that a plaintiff seeking the identity of an anonymous Internet critic in a defamation action must meet four requirements. First, the plaintiff must undertake efforts to notify the anonymous posters that they are the subject of a subpoena or other legal proceedings to reveal their identities and give them a reasonable opportunity to respond. "These notification efforts should include posting a message of notification of the identity discovery request to the anonymous user on the ISP's pertinent message board." *Id.* at 141. Second, the plaintiff must identify the exact statements made by each anonymous poster that the plaintiff alleges constitute defamation. *Id.* Third, the plaintiff's complaint must set forth a prima facie cause of action, i.e., the complaint must be able to withstand a motion to dismiss for failure to state a claim upon which relief can be granted. *Id.* Fourth, the plaintiff must produce sufficient evidence supporting each element of its cause of action on a prima facie basis before the court may order disclosure of the identity of the unknown defendant. *Id.* Once the plaintiff has met these requirements, then "the court must balance the defendant's First Amendment right of anonymous free speech against the strength of the prima facie case presented and the necessity for the disclosure of the anonymous defendant's identity to allow the plaintiff to properly proceed." *Id.* at 142.

The Delaware Supreme Court in *Cahill*, 884 A2d at 457, addressed this same issue. Consistently with *Dendrite*, *Cahill* rejected the idea that a plaintiff must merely allege a good-faith cause of action for defamation before seeking to identify an unknown defendant. The *Cahill* court explained that such a standard is too lenient because "even silly or trivial libel claims can easily survive" this threshold test. *Id.* at 459. Instead, the *Cahill* court adopted a modified version of the

*Dendrite* test, under which a "summary judgment" standard is the appropriate standard to use.

The *Cahill* court adopted *Dendrite*'s notice provision, holding that "to the extent reasonably practicable under the circumstances, the plaintiff must undertake efforts to notify the anonymous poster that he is the subject of a subpoena or application for order of disclosure." *Id.* at 460. Furthermore, if the case arises from anonymous statements on the Internet, the plaintiff must post a message notifying the anonymous defendant of the plaintiff's discovery request on the same ISP message board where the statements appeared. *Id.* at 461. The *Cahill* court explained:

> The notification provision imposes very little burden on a defamation plaintiff while at the same time giving an anonymous defendant the opportunity to respond. When First Amendment interests are at stake we disfavor *ex parte* discovery requests that afford the plaintiff the important form of relief that comes from unmasking an anonymous defendant. [*Id.*]

But the *Cahill* court determined that *Dendrite*'s requirement that a plaintiff provide the exact defamatory statements was subsumed in its summary-judgment standard and, therefore, unnecessary. *Id.* Additionally, it found that the balancing requirement was also unnecessary because "[t]he summary judgment test is itself the balance." *Id.*

*Cahill* further found that a plaintiff must present sufficient evidence to satisfy a summary-judgment standard, showing genuine issues of material fact, before obtaining the identity of an anonymous informant. *Id.* at 457, 462-463. However, *Cahill* rejected the idea that a plaintiff should be required to produce evidence of *all* elements of a defamation claim as required by *Dendrite*. *Cahill* noted that while a public figure ultimately must

prove that the defamatory statements were made with actual malice in order to prevail on his or her claim, presenting evidence showing that element would be unduly burdensome, if not impossible, without knowing the true identity of the defendant. *Id.* at 464. Accordingly, *Cahill* held that a plaintiff who is a public figure must only plead and prove facts with regard to elements of the claim that are *within his or her control*, leaving proof of actual malice until after the defendant is identified and further discovery conducted. *Id.* at 463-464. The *Cahill* court reasoned:

> [U]nder the summary judgment standard, scrutiny is likely to reveal a silly or trivial claim, but a plaintiff with a legitimate claim should be able to obtain the identity of an anonymous defendant and proceed with his lawsuit.... [T]rial judges will then still provide a potentially wronged plaintiff with an adequate means of protecting his reputation thereby assuring that our courts remain open to afford redress of injury to reputation caused by the person responsible for abuse of the right to free speech. [*Id.* at 464.]

Courts from other jurisdictions that have addressed these issues have mainly followed *Dendrite*,[6] *Cahill*,[7] or a modified version of those standards.[8] But in *Maxon v Ottawa Publishing Co*, 402 Ill App 3d 704; 341 Ill Dec

---

[6] See, e.g., *Mortgage Specialists, Inc v Implode-Explode Heavy Indus, Inc*, 160 NH 227; 999 A2d 184 (2010).

[7] See, e.g., *Solers, Inc v Doe*, 977 A2d 941 (DC App, 2009); *In re Does 1-10*, 242 SW3d 805 (Tex App, 2007); *Krinsky v Doe 6*, 72 Cal Rptr 3d 231; 159 Cal App 4th 1154 (2008).

[8] Some jurisdictions have applied a modified version of the *Cahill* standard with the balancing test from *Dendrite*. See, e.g., *Pilchesky v Gatelli*, 2011 PA Super 3; 12 A3d 430 (2011); *Indep Newspapers v Brodie*, 407 Md 415; 966 A2d 432 (2009); *Mobilisa Inc v Doe*, 217 Ariz 103; 170 P3d 712 (Ariz App, 2007). And one court applied the *Cahill* test, but found that the *Dendrite* balancing test should be applied when consideration of the *Cahill* factors did not lead to a clear outcome. See *SaleHoo Group Ltd*, 722 F Supp 2d at 1215-1217.

12; 929 NE2d 666 (2010), the Illinois Court of Appeals rejected both the *Dendrite* and *Cahill* tests for public-official plaintiffs seeking the identities of anonymous Internet critics who allegedly defamed them. While noting that certain types of anonymous speech are constitutionally protected, *id.* at 712, the court found no need to apply the tests of *Dendrite* or *Cahill* because the applicable Illinois court rule required that the petition for discovery of anonymous defendants be verified and state with particularity facts that would establish a cause of action for defamation, *id.* at 714-715. Notably, the court concluded that its court rules effectively required the plaintiff to allege and swear to specific facts stating a prima facie case for defamation. *Id.* at 715. Thus, even *Maxon*, while expressly rejecting *Dendrite* and *Cahill*, nonetheless de facto approved the same summary-judgment standard.

As previously noted, this Court in *Cooley* declined to adopt any additional standards and held, similarly to the Illinois court, that Michigan's rules of civil procedure adequately protect an anonymous defendant in a defamation case. The *Cooley* Court concluded that the procedures found in MCR 2.302(C) regarding protective orders coupled with the procedures for summary disposition under MCR 2.116(C)(8) adequately protect a defendant's First Amendment interests in anonymity. *Cooley*, 300 Mich App at 264. The Court explained that a deficient claim can be dismissed before any discovery is accomplished because in order to survive a motion for summary disposition under MCR 2.116(C)(8), a defamation claim must be pleaded "with specificity by identifying the exact language that the plaintiff alleges to be defamatory." *Id.* at 262. See also *Tomkiewicz v Detroit News, Inc*, 246 Mich App 662, 666; 635 NW2d 36 (2001) (noting "that summary disposition is an essential tool

in the protection of First Amendment rights") (quotation marks and citations omitted).

The *Cooley* Court further stated that protective orders are extremely flexible, noting that

> [a] trial court may tailor the scope of its protective order to protect a defendant's First Amendment interests until summary disposition is granted. For instance, a trial court may order (1) that a plaintiff not discover a defendant's identity, or (2) that as a condition of discovering a defendant's identity, a plaintiff not disclose that identity until after the legal sufficiency of the complaint itself is tested. [*Cooley*, 300 Mich App at 265.]

The Court therefore concluded that the standard enunciated in *Cahill* largely overlaps with the protections afforded under MCR 2.302(C) and MCR 2.116(C)(8). *Id.* at 266. But in *Cooley*, the court rules were adequate to protect the anonymous defendant only because he was aware of and involved in the lawsuit. See *id.* at 252, 270. As the partial dissent in *Cooley* noted, "[A]n anonymous defendant cannot undertake any efforts to protect against disclosure of his or her identity until the defendant learns about the lawsuit—which may well be too late . . . ." *Id.* at 274 (BECKERING, J., concurring in part and dissenting in part).

In the present case, no defendant was notified of the lawsuit and no defendant had been involved with any of the proceedings, which means that there was no one to move for summary disposition under MCR 2.116(C)(8). Thus, one of the two protections that *Cooley* relied upon is conspicuously absent.[9] Further,

---

[9] Similar to the age-old question of whether a tree falling in the woods makes a sound if no one is there to hear it, one might also ask, if no truly interested party is present to invoke the protections available under MCR 2.116(C)(8), do the protections really exist?

when defendants are not aware of and not involved
with a lawsuit, any protection to be afforded through
the entry of a protective order under MCR 2.302(C) is
*contingent* upon a nonparty, e.g., the Internet service
provider, asserting the defendants' First Amendment
rights. Thus, application of the *Cooley* protection
scheme in the instant case, containing circumstances
which *Cooley* declined to address, appears inadequate
to protect the constitutional rights of an anonymous
defendant who is unaware of pending litigation.

Therefore, we conclude that when an anonymous
defendant in a defamation suit is not shown to be aware
of or involved with the lawsuit, some showing by the
plaintiff and review by the trial court are required in
order to balance the plaintiff's right to pursue a meri-
torious defamation claim against an anonymous critic's
First Amendment rights. Although we agree with the
dissent in *Cooley* that it would have been preferable to
also adopt the *Dendrite/Cahill* standard requiring a
plaintiff to further produce evidence sufficient to sur-
vive a motion under MCR 2.116(C)(10), we nevertheless
are bound by this Court's conclusion in *Cooley* that
MCR 2.302(C) and MCR 2.116(C)(8) alone are sufficient
to protect a participating defendant's First Amendment
rights. Therefore, we invite the Legislature or the
Supreme Court to consider anew this important ques-
tion.[10]

Having concluded that we must apply the *Cooley*
standards in this case, we reiterate, as *Cooley* itself
acknowledged, that *Cooley* does not address a circum-

---

[10] We recognize that *Cooley* was limited to its narrow set of facts, and
therefore, it is possible for us to distinguish *Cooley* and adopt the more
stringent *Dendrite* standard for application here and in similar cir-
cumstances. We decline, however, to adopt a second standard of law in
this complex and emerging area of jurisprudence in an effort to avoid
creating unnecessary confusion and inconsistency.

stance, such as is presented in the instant case, in which anonymous defendants are unaware of the pending lawsuit. Accordingly, given the specific facts of this case, we find it necessary to impose two additional requirements in an effort to balance the plaintiff's right to pursue a meritorious defamation claim against an anonymous critic's First Amendment rights.

First, we hold that the notice requirement of *Dendrite/Cahill* is properly applicable here: a plaintiff must have made reasonable efforts to provide the anonymous commenter with reasonable notice that he or she is the subject of a subpoena or motion seeking disclosure of the commenter's identity. That means that at a minimum, if possible, the plaintiff must post a message on the same message board or other forum where the alleged defamatory message appeared, notifying the anonymous defendant of the legal proceedings. See *Cahill*, 884 A2d at 460-461; *Dendrite*, 342 NJ Super at 141.

Second, the plaintiff's claims must be evaluated by the court so that a determination is made as to whether the claims are sufficient to survive a motion for summary disposition under MCR 2.116(C)(8). This evaluation is to be performed even if there is no pending motion for summary disposition before the court. The *Cooley* Court explained that summary disposition was a vital tool to protect defendants:

> Because a plaintiff must include the words of the libel in the complaint, several questions of law can be resolved on the pleadings alone, including: (1) whether a statement is capable of being defamatory, (2) the nature of the speaker and the level of constitutional protections afforded the statement, and (3) whether actual malice exists, if the level of fault the plaintiff must show is

actual malice.[11] [*Cooley*, 300 Mich App at 263 (citations omitted).]

MCR 2.116(I)(1) authorizes a court to perform this sua sponte review. *Wilson v King*, 298 Mich App 378, 381 n 4; 827 NW2d 203 (2012).

The imposition of these two additional requirements on a plaintiff when a defendant is not aware of the pending lawsuit will operate to ensure that the protections described in *Cooley* have meaningful effect.

III

A

Under the first of the additional requirements we apply here, a plaintiff seeking the identity of an anonymous Internet critic who is unaware of the pending defamation suit must make reasonable efforts to notify the anonymous commenters of the legal proceedings seeking to uncover their identities in order to give them a reasonable opportunity to respond. While plaintiff in this case made efforts to *discern the identities* of the anonymous defendants, his affidavits and pleadings do not show that he made any effort to *notify* the anonymous defendants of the pending action, either through The Warren Forum Internet site or other means. Because plaintiff did not show that he made reasonable attempts to inform the

---

[11] Although whether actual malice exists is a question of law, *Ireland*, 230 Mich App at 619, the statement that the question can be answered on the pleadings alone is not accurate in the context of anonymous defendants because actual malice is "a *subjective* inquiry concentrating on the knowledge of a defendant at the time of a publication," which likely is not ascertainable if the defendant is not known. *Battaglieri v Mackinac Ctr For Pub Policy*, 261 Mich App 296, 305; 680 NW2d 915 (2004).

anonymous defendants of his efforts to discover their identities, he has not met the first requirement. Therefore, on this basis alone, the trial court erred by not granting Munem's motion seeking a protective order.

B

Further, plaintiff's claims are facially deficient and cannot survive a motion for summary disposition under MCR 2.116(C)(8). As noted earlier, "[a] plaintiff claiming defamation must plead a defamation claim with specificity by identifying the exact language that the plaintiff alleges to be defamatory." *Cooley*, 300 Mich App at 262. Here, the alleged defamatory statements were not identified in plaintiff's complaint. Instead, plaintiff only (and for the first time) cited the alleged defamatory statements in his response to Munem's motion for a protective order. Thus, defendants were entitled to summary disposition under MCR 2.116(C)(8), and it was improper to permit plaintiff to depose Munem.

C

MCR 2.116(I)(5) requires that if summary disposition is appropriate under MCR 2.116(C)(8), as is the case here, plaintiffs shall be given the opportunity to amend their pleadings, unless the amendment would be futile. *Weymers v Khera*, 454 Mich 639, 658; 563 NW2d 647 (1997). Thus, even though plaintiff's complaint is patently deficient by virtue of his failure to cite the actual complained-of statements in the complaint, we will analyze the alleged defamatory statements to determine whether allowing plaintiff to amend the complaint to contain the contents of these statements would be futile.

In Michigan, the four basic elements of a defamation claim are as follows:

> "(1) a false and defamatory statement concerning the plaintiff, (2) an unprivileged communication to a third party, (3) fault amounting at least to negligence on the part of the publisher, and (4) either actionability of the statement irrespective of special harm (defamation per se) or the existence of special harm caused by publication." [*Smith*, 487 Mich at 113, quoting *Mitan v Campbell*, 474 Mich 21, 24; 706 NW2d 420 (2005).]

As noted earlier, the First Amendment demands that, related to a defendant's "fault," if the plaintiff is a public official or public figure, then the plaintiff must prove by clear and convincing evidence that the defendant made the statement with actual malice. *Ireland*, 230 Mich App at 622.

When determining whether statements made against public officials amount to unprotected defamation, appellate courts must make an independent examination of the whole record to ensure against forbidden intrusions into the field of free expression. *Smith*, 487 Mich at 112 n 16; *Ireland*, 230 Mich App at 613; *Northland Wheels Roller Skating Ctr, Inc v Detroit Free Press, Inc*, 213 Mich App 317, 322; 539 NW2d 774 (1995). Courts must examine the statements and the circumstances under which they were made to determine whether the statements are subject to First Amendment protection. *New York Times*, 376 US at 285; *Northland Wheels*, 213 Mich App at 322. Whether a statement is actually capable of defamatory meaning is a preliminary question of law for the court to decide. *Ireland*, 230 Mich App at 619.

"[I]n general, our society accords greater weight to the value of free speech than to the dangers of its misuse." *McIntyre*, 514 US at 357. "A rule compelling

the critic of official conduct to guarantee the truth of all his factual assertions—and to do so on pain of libel judgments virtually unlimited in amount—leads to a comparable 'self-censorship.' " *New York Times*, 376 US at 279. "Under such a rule, would-be critics of official conduct may be deterred from voicing their criticism, even though it is believed to be true and even though it is in fact true, because of doubt whether it can be proved in court or fear of the expense of having to do so." *Id.* "[D]ebate on public issues should be uninhibited, robust, and wide-open, and . . . may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *Id.* at 270. "Even a false statement may be deemed to make a valuable contribution to public debate, since it brings about the clearer perception and livelier impression of truth, produced by its collision with error." *Id.* at 279 n 19 (citation and quotation marks omitted).

To be considered defamatory, statements must assert facts that are "provable as false." *Milkovich v Lorain Journal Co*, 497 US 1, 19; 110 S Ct 2695; 111 L Ed 2d 1 (1990). Even statements couched in terms of opinion may often imply an assertion of objective fact and, thus, can be defamatory. *Id.* at 19-20; *Smith*, 487 Mich at 128. "The dispositive question . . . is whether a reasonable fact-finder could conclude that the statement implies a defamatory meaning." *Smith*, 487 Mich at 128.

Accusations of criminal activity are considered "defamation per se" under the law and so do not require proof of damage to the plaintiff's reputation. *Tomkiewicz*, 246 Mich App at 667 n 2; *Burden v Elias Bros Big Boy Restaurants*, 240 Mich App 723, 728-729; 613 NW2d 378 (2000). However, not all statements that can be read as accusations of a crime or misconduct should be considered assertions of fact. The First Amendment

protects statements that cannot be interpreted as stating actual facts about an individual from serving as the basis for a defamation action or similar claim under state law. *Milkovich*, 497 US at 20; *Falwell*, 485 US at 50, 53-55; *Ireland*, 230 Mich App 617. Such statements include the usual rhetorical hyperbole and imaginative expression often found in satires, parodies, and cartoons. *Falwell*, 485 US at 53-54; *Ireland*, 230 Mich App at 617-618. This is true even when the statements are designed to be highly offensive to the person criticized, and even if, when read literally, the statements can be interpreted as accusations of criminal activity. Terms such as "blackmailer," "traitor," "crook," "steal," and "criminal activities" must be read in context to determine whether they are merely exaggerations of the type often used in public commentary. *Greenbelt Coop Publishing Ass'n v Bresler*, 398 US 6, 14; 90 S Ct 1537; 26 L Ed 2d 6 (1970); *Kevorkian v American Med Ass'n*, 237 Mich App 1, 7-8; 602 NW2d 233 (1999). Casual use of these terms and similar epithets "is the language of the rough-and-tumble world of politics. It is core political speech. It is consumed by an often skeptical and wary electorate" and is not seriously regarded as asserting factual truth. *In re Chmura (After Remand)*, 464 Mich 58, 82; 626 NW2d 876 (2001). If a reasonable reader would understand these epithets as merely "rhetorical hyperbole" meant to express strong disapproval rather than an accusation of criminal activity or actual misconduct, they cannot be regarded as defamatory. *Greenbelt*, 398 US at 14. See also *Ireland*, 230 Mich App at 618-619.

The context and forum in which statements appear also affect whether a reasonable reader would interpret the statements as asserting provable facts. Courts that have considered the matter have concluded that Internet message boards and similar communication plat-

forms are generally regarded as containing statements of pure opinion rather than statements or implications of actual, provable fact. See *Summit Bank v Rogers*, 206 Cal App 4th 669, 696-698; 142 Cal Rptr 3d 40 (2012); *Sandals Resorts Int'l Ltd v Google, Inc*, 925 NYS2d 407, 415-416; 86 AD3d 32 (2011); *Obsidian Fin Group, LLC v Cox*, 812 F Supp 2d 1220, 1223-1224 (D Or, 2011); *Cahill*, 884 A2d at 465. "[A]ny reader familiar with the culture of . . . most electronic bulletin boards . . . would know that board culture encourages discussion participants to play fast and loose with facts. . . . Indeed, the very fact that most of the posters remain anonymous, or pseudonymous, is a cue to discount their statements accordingly." *Summit Bank*, 206 Cal App 4th at 696-697 (quotation marks and citation omitted).

> Ranked in terms of reliability, there is a spectrum of sources on the internet. For example, chat rooms and blogs are generally not as reliable as the *Wall Street Journal Online*. Blogs and chat rooms tend to be vehicles for the expression of opinions; by their very nature, *they are not a source of facts or data upon which a reasonable person would rely.* [*Cahill*, 884 A2d at 465 (emphasis added; citation omitted).]

The statements at issue in this case were posted on The Warren Forum and were in response to two events that had been covered by the local news media: (1) the discovery that 3,647 tons of road salt was missing from the city's supply and might have been "misappropriate[ed]," and (2) the city's decision to purchase new garbage trucks, which some members of the community had concluded were not really needed.

As noted earlier, two of the statements were responses to a thread entitled, "Where did our road salt go?" The first allegedly defamatory statement was posted by someone using the pseudonym "northend":

I wouldn't be surprised if the salt is close to city hall and
the storage area for the city. IMO the salt is somewhere
around the sports complex on Van Dyke, just south of 14
Mile, where Gus hangs out and drinks most days, or at
least the days I am in there hitting golf balls. Hmm maybe
I need to call the investigators?

This message cannot be construed as asserting as a fact
that plaintiff stole or was involved in the theft of the
salt. Nowhere does northend state that plaintiff was
involved with the salt's disappearance, only that the
salt may be near a sports complex where plaintiff
purportedly spends time. Thus, this statement is not
defamatory as a matter of law.

In the same discussion thread, user "yogi" stated,
"[T]he pizza box maker sold it! him an Gus probably
split the money." This appears to be someone's attempt
at a joke. A reasonable reader would not take the
statement literally. First, the introduction of a "pizza
box maker" seems to be a non sequitur, which itself
suggests a humorous intent. Second, the use of the
exclamation point also connotes a humorous intent.[12]
Finally, the use of the word "probably" makes the
purported asserted fact hardly provable. Thus, when
read in context, a reasonable reader would understand

---

[12] In ordinary writing, exclamation marks "should not be used . . . to
signal the humorous intent of a comment whose humour might
otherwise go unrecognized." Allen, ed, *Pocket Fowler's Modern English
Usage* (New York: Oxford University Press, 2008), p 242. But as noted
earlier, Internet message boards are an extremely informal medium
for communication where formalities are rarely followed. See *Cahill*,
884 A2d at 465; *ComputerXpress, Inc v Jackson*, 93 Cal App 4th 993,
1011-1013; 113 Cal Rptr 2d 625 (2001). In fact, the use of exclamation
points in electronic communication is rampant and now gives a literal
meaning to the quotation attributed to F. Scott Fitzgerald: "An
exclamation point is like laughing at your own joke." See Muther,
*Confessions of a Serial Exclamation Pointer*, Boston Globe (April 26,
2012), p G16.

these words as being merely rhetorical hyperbole, and they cannot be regarded as defamatory.

The other statements in issue were replies to an initial posting titled "MORE sanitation trucks? Yep," which concerned the city's decision to buy additional new garbage trucks. The third allegedly defamatory statement was posted by hatersrlosers in this thread and stated:

> They are only getting more garbage trucks because Gus needs more tires to sell to get more money for his pockets :P

This statement on its face cannot be taken seriously as asserting a fact. The use of the ":P" emoticon makes it patently clear that the commenter was making a joke. As noted earlier, a ":P" emoticon is used to represent a face with its tongue sticking out to denote a joke or sarcasm. Thus, a reasonable reader could not view the statement as defamatory.

Later in this discussion regarding the garbage trucks, pstigerfan posted the following:

> Since Warren is the only community in Macomb County to have city employees pick up trash, then [Mayor] Fouts must have a better idea of what is going on compared to the other communities. Oh wait, his buddies Gus and Dick run the department, and in turn make money off of it (selling tires, selling road salt, etc). If we didn't have a Sanitation Department with new trucks (and old tires), then Gus would have to take tires off of other vehicles in other departments in order to make his money.

Again, a reasonable reader would not take this statement literally. The tone of the entire statement is sarcastic and humorous. The writer obviously does not think that Mayor Fouts has a "better idea" of how to run Warren compared with how other community leaders run their communities. And the vision of

plaintiff sneaking into other departments to steal tires off of other city vehicles is so absurd that the vision of it is comical. Thus, when viewed in context, the entire statement cannot be deemed to be an assertion of a provable fact, and it is not defamatory.

In sum, plaintiff maintains that all of the statements constitute actionable statements of fact that accuse him of stealing public property. Review of these statements in context leads us to conclude that they cannot be regarded as assertions of fact but, instead, are only acerbic critical comments directed at plaintiff based on facts that were already public knowledge, namely the apparent misappropriation of a large amount of rock salt and the controversial purchase of additional garbage trucks. The joking, hostile, and sarcastic manner of the comments, the use of an emoticon showing someone sticking their tongue out, and the far-fetched suggestion that plaintiff somehow hid over 3,600 tons of salt near the city sports complex all indicate that these comments were made facetiously and with the intent to ridicule, criticize, and denigrate plaintiff rather than to assert knowledge of actual facts. Examination of the statements and the circumstances under which they were made show them to be mere expressions of rhetorical hyperbole and not defamatory as a matter of law. Therefore, allowing plaintiff to amend his complaint would be futile.

We reverse the trial court's decision to allow discovery of Munem for the purpose of identifying the anonymous defendants, and we remand for the trial court to enter judgment in favor of defendants. Munem, as the prevailing party, may tax costs pursuant to MCR 7.219. We do not retain jurisdiction.

TALBOT, P.J., concurred with WILDER, J.

STEPHENS, J. (*concurring*). I concur with my colleagues that this matter should be reversed and remanded to the trial court for entry of judgment in favor of defendants. I write separately to address with specificity my belief that Michigan should adopt the analysis of the Delaware Supreme Court in *Doe v Cahill*, 884 A2d 451, 457, 462-464 (Del, 2005), in which that court noted that while a plaintiff who is a public figure needs to prove actual malice to prevail on a claim of defamation, proving malice when the identity of the defendant is unknown is unduly burdensome. Thus, the plaintiff need not plead facts in support of the element of actual malice in order to ascertain the identity of the person or persons who authored the defamatory statements.

The reasoning of the *Cahill* court is compelling that

under the summary judgment standard, scrutiny is likely to reveal a silly or trivial claim, but a plaintiff with a legitimate claim should be able to obtain the identity of an anonymous defendant and proceed with his lawsuit. . . . [T]rial judges will then still provide a potentially wronged plaintiff with an adequate means of protecting his reputation thereby assuring that our courts remain open to afford redress of injury to reputation caused by the person responsible for abuse of the right to free speech. [*Id*. at 464.]

I understand that there is a significant split of opinion among other jurisdictions on this issue. As the majority has noted, many jurisdictions have followed some blend of *Dendrite Int'l, Inc v Doe No 3*, 342 NJ Super 134; 775 A2d 756 (NJ App, 2001), and *Cahill* with some taking the *Dendrite* approach on actual malice and others adopting the *Cahill* standard. I urge that Michigan follow the analysis and reasoning in *Cahill* given the extreme difficulty of proving the malice of those cloaked in anonymity.