# STATE OF MICHIGAN

# COURT OF APPEALS

LENORE KAGEN a.k.a. LENORE GAURINO,

      Plaintiff-Appellee,

v

RICHARD J. KAGEN,

      Defendant-Appellant.

UNPUBLISHED
July 14, 2015

No.  318459
Oakland Circuit Court
LC No.  2010-779424-DM

AFTER REMAND

Before:  O'CONNELL, P.J., and BORRELLO and GLEICHER, JJ.

PER CURIAM.

We previously remanded this matter to the circuit court for reconsideration of whether securing vaccinations for the parties' minor children was in the children's best interests. *Kagen v Kagen*, unpublished opinion per curiam of the Court of Appeals, issued December 18, 2014 (Docket No. 318459) (*Kagen I*). Our opinion described in considerable detail the circuit court's several legal errors and clearly erroneous factual findings. At its conclusion, we set forth a course of action to be undertaken on remand.

We first directed the circuit court to verify that the vaccination decision would not affect the children's established custodial environment. The court complied. Next, we instructed that Mr. Kagen needed to present only an evidentiary preponderance to prove that updating the children's vaccinations would serve their best interests. Because the circuit court had not previously considered on the record the statutory best-interest factors of MCL 722.23 as required by binding precedent of this Court and our Supreme Court, we directed the court to identify and apply all relevant factors. We also clarified for the circuit court the evidentiary principles governing the admissibility of vaccine-related evidence.

On remand, the circuit court again determined that Mr. Kagen had not met his burden of proving that vaccination was in the children's best interests. Unfortunately, the circuit court rested its decision on patently inadmissible evidence. Because the admissible evidence before the court established by more than a preponderance that updating the children's standard vaccinations would be in their best interests, we reverse and remand for entry of an order consistent with this opinion.

# I. EVIDENTIARY ERROR

In our prior opinion, we held that the circuit court erred by excluding Mr. Kagen's proffered reports from the Center for Disease Control (CDC), National Institute of Health (NIH), Food and Drug Administration (FDA), and Michigan Department of Community Health (MDCH). Although hearsay, these reports were admissible under the catch-all exception of MRE 803(24). Vital to our decision was that "[a]ll four reports are official (formal) statements by government agencies." *Kagen I*, unpub op at 5. That the reports were prepared in the declarants' official capacities and were presented in a public forum assured that the declarants had verified the accuracy of the information before its dissemination. *Id.* at 5-6.

On remand, the circuit court allowed Mrs. Kagen equal opportunity to present rebuttal evidence. This was the correct course of action. However, the circuit court completely abandoned its duty to assess the admissibility of the evidence. The circuit court accurately recited the four elements outlined in *People v Katt*, 468 Mich 272, 290; 662 NW2d 12 (2003), underlying admissibility pursuant to MRE 803(24): "To be admitted under MRE 803(24), a hearsay statement must: (1) demonstrate circumstantial guarantees of trustworthiness equivalent to the categorical exceptions, (2) be relevant to a material fact, (3) be the most probative evidence of that fact reasonably available, and (4) serve the interests of justice by its admission." However, the circuit court failed to consider in any meaningful way whether Mrs. Kagen's proffered evidence met these requirements.

In *Katt*, 468 Mich at 291 n 11, our Supreme Court quoted with approval various factors that federal courts have adopted in analyzing a statement's trustworthiness. Of particular relevance here are the following factors:

> (3) The personal truthfulness of the declarant. If the declarant is an untruthful person, this cuts against admissibility, while an unimpeachable character for veracity cuts in favor of admitting the statement. The government cannot seriously argue that the trust due an isolated statement should not be colored by compelling evidence of the lack of credibility of its source: although a checkout aisle tabloid might contain unvarnished truth, even a devotee would do well to view its claims with a measure of skepticism.

> (4) Whether the declarant appeared to carefully consider his statement.

> * * *

> (8) Whether the declarant had personal knowledge of the event or condition described.

> * * *

> (11) Whether the statement was made under formal circumstances or pursuant to formal duties, such that the declarant would have been likely to consider the accuracy of the statement when making it.

In relation to several pieces of Mrs. Kagen's evidence, the court bypassed its duty to consider the document's trustworthiness, a prerequisite to admissibility, reasoning that such considerations affected only the weight of the evidence. This was error. We need not remand to give the circuit court a third chance, however, as the record permits only one resolution of the issue presented.

We first note that the court admitted an article presented on a website managed by the United States Department of Health and Human Services (USDHHS), and another from the CDC. In *Kagen I*, we discussed at length why such documents are admissible despite being hearsay. Such reports "were prepared by experts in the field of child immunizations and were based on scientific study," we reasoned, and "it would impose an unreasonable burden to expect [the party] to present the testimony of the government agents who compiled or prepared the reports." *Kagen I*, unpub op at 5. Accordingly, such reports produced by government agents are "the most probative evidence of [a material] fact [that is] reasonably available." See *Katt*, 468 Mich at 290. As noted, such formal reports are also reliable as required under the first *Katt* factor as they are created by individuals in their official capacities and for public dissemination, invoking a special duty to ensure accuracy. *Kagen I*, unpub op at 5-6. Accordingly, we need look no further to conclude that the circuit court properly admitted these documents presented by Mrs. Kagen.

However, the circuit court also admitted several documents bearing absolutely no indicia of reliability. We will address each document in turn, reviewing de novo the preliminary question of whether an evidentiary rule precludes admission of the proffered document. *People v Gursky*, 486 Mich 596, 606; 786 NW2d 579 (2010).

## A. WIKIPEDIA.COM

Mrs. Kagen presented a list of vaccine ingredients from Wikipedia.com. Mr. Kagen's counsel objected to the admission of this document based "on the substance of the proposed exhibit" and the failure to "identify any author or the source of the information." The court ruled that Mr. Kagen's objections went "to weight rather than admissibility." Considering the trustworthiness of a document cannot be punted when analyzing admissibility under MRE 803(24). And documents from Wikipedia.com are not inherently trustworthy.[1] The site

---

[1] See, e.g., *Badasa v Mukasey*, 540 F3d 909, 910 (CA 8, 2008); *Bing Shun Li v Holder*, 400 Fed Appx 854, 857 (CA 5, 2010) ("We agree with those courts that have found Wikipedia to be an unreliable source of information."); *United States v Lawson*, 677 F3d 629, 650 (CA 4, 2012) ("Given the open-access nature of Wikipedia, the danger in relying on a Wikipedia entry is obvious and real. As the "About Wikipedia" material aptly observes, "[a]llowing any-one to edit Wikipedia means that it is more easily vandalized or susceptible to unchecked information." Further, Wikipedia aptly recognizes that it "is written largely by amateurs."); *Johnson v Colvin*, unpublished opinion of the United States District Court for District of Maine, decided September 25, 2014 (Docket No. 1:13-cv-406-DBH) ("Counsel are reminded that this court has not accepted Wikipedia as a reliable medical reference."); *Smartphone Techs LLC v Research in Motion Corp*, unpublished opinion of the United States District Court for the Eastern District of Texas, filed February 13, 2012 (Docket No. 6:10-CV-74-LED-JDL) (citations omitted) ("The

advertises itself as "the free encyclopedia that *anyone can edit.*" See <http://en.wikipedia.org/wiki/Main_Page> (accessed July 1, 2015) (emphasis added). We cannot fathom that a document containing content that can be altered by anyone at any time could possibly "demonstrate circumstantial guarantees of trustworthiness." *Katt*, 468 Mich at 290. Accordingly, the circuit court erred in admitting this evidence.

## B. MICKEY AND MINNIE MOUSE

Mrs. Kagen presented an article entitled *Should Mickey and Minnie Mouse Be Vaccinated?* from Dr. Brownstein's Holistic Medicine Blog, February 2, 2015, <http://blog.drbrownstein.com/should-mickey-and-minnie-mouse-be-vaccinated/> (accessed July 1, 2015). Mr. Kagen's counsel objected to the admission of this document because "it does not relate to any immunology study or any vaccination study whatsoever." Rather, counsel argued, the article gave the writer's "personal opinion about the effects of vaccinations, but doesn't back it up with any studies whatsoever." The author of the "Holistic Medicine Blog" expressed his views that the CDC "is committing fraud, and . . . needs to be investigated." Counsel described the website as an "advertisement" vehicle for a "for-profit business." The

---

content on this website is provided by volunteers from around the world—anyone with internet access can provide or modify content. Thus, not only is the information unreliable, but it can potentially change on a day-to-day basis.").

As described in great detail in *Campbell v Secretary of Health & Human Servs*, 69 Fed Cl 775, 781 (2006):

> The articles that the Special Master culled from the Internet do not—at least on their face—remotely meet this reliability requirement. Consider the item on "febrile seizures" that she added from the Dictionary of Neurology, www.explore-medicine.com. Although that website no longer exists, the exhibit introduced by the Special Master indicates that its information was drawn from Wikipedia.com, a website that allows virtually anyone to upload an article into what is essentially a free, online encyclopedia. A review of the Wikipedia website reveals a pervasive and, for our purposes, disturbing series of disclaimers, among them, that: (i) any given Wikipedia article "may be, at any given moment, in a bad state: for example it could be in the middle of a large edit or it could have been recently vandalized;" (ii) Wikipedia articles are "also subject to remarkable oversights and omissions;" (iii) "Wikipedia articles (or series of related articles) are liable to be incomplete in ways that would be less usual in a more tightly controlled reference work;" (iv) "another problem with a lot of content on Wikipedia is that many contributors do not cite their sources, something that makes it hard for the reader to judge the credibility of what is written;" and (v) "many articles commence their lives as partisan drafts" and may be "caught up in a heavily unbalanced viewpoint."

While none of these sources bind this Court, we find their content instructive and persuasive. See *Abela v Gen Motors Corp*, 469 Mich 603, 607; 677 NW2d 325 (2004); *Paris Meadows, LLC v City of Kentwood*, 287 Mich App 136, 145 n 3; 783 NW2d 133 (2010).

court admitted, "I don't know the Center for Holistic Medicine" and asked Mrs. Kagen to explain the organization. Mrs. Kagen confessed, "Honestly, I don't know that much. . . . I can only read stuff and I don't know who is reputable, who is not." The court overruled Mr. Kagen's objection, again concluding that his concerns went "to weight rather than admissibility."

A blog by its very nature is not akin to a formal and official statement presented by a government agency. A blog is a "[w]eb site that contains online personal reflections, comments, and often hyperlinks provided by the writer." *Merriam-Webster's Collegiate Dictionary* (11th ed), p 133. As described by this Court in *Ghanam v Does*, 303 Mich App 522, 547; 845 NW2d 128 (2014) (quotation marks and citation omitted):

> Ranked in terms of reliability, there is a spectrum of sources on the internet. For example, chat rooms and blogs are generally not as reliable as the *Wall Street Journal Online*. Blogs and chat rooms tend to be vehicles for the expression of opinions; by their very nature, they are not a source of facts or data upon which a reasonable person would rely.

Dr. Brownstein is a Michigan licensed physician, <https://w2.lara.state.mi.us/VAL/License/Details/75537> (accessed July 1, 2015), and purports to be a board-certified family physician, <http://www.drbrownstein.com/aboutus.asp> (accessed July 1, 2015). However, nothing about the particular blog article supports its trustworthiness. The article is a reaction to the outcry following the Disneyland measles outbreak. It includes a chart outlining deaths from diphtheria, pertussis, and measles before and after the widespread use of vaccinations derived from a source called www.healthsentinel.com. The article discusses "[a] scientific review from Dr. Helen Ratajczak," but references only an article regarding Ratajczak from CBS News. Dr. Ratajczak's actual study may have been a useful tool in analyzing the parties' debate. However, an article from a doctor unconnected to any scientific study does not share the characteristics of trustworthiness necessary to be admitted under MRE 803(24).

## C. SNOPES.COM

Mrs. Kagen also introduced an article entitled *On Gardasil* from Snopes.com. See <http://www.snopes.com/medical/drugs/gardasil.asp> (accessed July 1, 2015). Mrs. Kagen admitted that she was uncertain whether the information in the article was from a scientific study. Rather, she visited the website on the recommendation of "a doctor friend of mine." The circuit court appeared to be unfamiliar with the website and Mr. Kagen attempted to educate the court on its dubious nature, but the court interrupted him. Ultimately, the court found that the content of the article did not actually support Mrs. Kagen's position, but that it was admissible.

The court should have allowed Mr. Kagen to continue in his explanation. Snopes.com is a website that "has come to be regarded as an online touchstone of rumor research." See <http://www.snopes.com/info/aboutus.asp> (accessed July 1, 2015). The site touts: "Welcome to snopes.com, the definitive Internet reference source for urban legends, folklore, myths, rumors, and misinformation." <http://www.snopes.com/> (accessed July 1, 2015). The website's purpose is to conduct research to verify or disprove claims made on the Internet or rumors being spread through society. There is no indication that the vaccination article proffered by Mrs. Kagen was compiled by someone with any medical knowledge. Accordingly, we

discern no method to verify the article's trustworthiness, and the circuit court should have excluded it.

## D. HEALTH IMPACT NEWS

Mrs. Kagen introduced an article by John P. Thomas titled *Moulden—A Search for Life and Truth*, Health Impact News, <http://healthimpactnews.com/2014/dr-andrew-moulden-every-vaccine-produces-harm/> (accessed July 1, 2015). Mrs. Kagen testified that she visited this website on the recommendation of "a well known chiropractor who helps athletes with all kinds of medical problems." In relation to "Health Impact News," Mrs. Kagen argued, "Every doctor I've talked to who remotely thinks about what you're putting into your body has recommended the site[.]"

The article purports to present scientific evidence uncovered by Dr. Andrew Moulden regarding the dangers of vaccinations. It is not a direct account of Dr. Moulden's research and there is no indication that the author is a physician or has any medical training. Rather, the article reads like a tabloid story of the late doctor's persecution at the hands of vaccine advocates. The article suggests that the pharmaceutical industry assassinated the doctor and thereafter "eras[ed] most all of the information that was once available on the internet" about the doctor's teachings. *Id.* The writer even challenges the "germ model of disease." *Id.* As noted by Mr. Kagen's counsel:

> [T]here's no studies -- there's no scientific studies; it's all conjecture, it's all based upon speculation, it's based upon rumor, it's based upon fear mongering, it's based on their wanting to sell products to the public.

The circuit court overruled Mr. Kagen's objection, again finding that his challenge went to weight rather than admissibility. Again, the court committed legal error, as this web article was clearly inadmissible hearsay. The article demonstrates no "circumstantial guarantees of trustworthiness" as required by *Katt*, 468 Mich at 290, particularly given the article's tone. See *id.* at 291 n 11 [factor (3)]. No portion of the article suggests that the writer conducted any studies to establish "personal knowledge" of the claims made. See *id.* at 291 n 11 [factor (8)]. And the article's statements certainly were not "made under formal circumstances or pursuant to formal duties, such that the declarant would have been likely to consider the accuracy of the statement when making it." See *id.* at 291 n 11 [factor (11)]. The admission of this article, even if given negligible weight by the court, contravened the rules of evidence.

## E. YET ANOTHER PHYSICIAN'S PERSONAL WEBSITE

Mrs. Kagen presented Dr. Russell L. Blaylock, *Vaccination Dangers Can Kill You or Ruin Your Life*, May 12, 2014, <http://articles.mercola.com/sites/articles/archive/2004/05/12/vaccination-dangers.aspx> (accessed July 1, 2015). She indicated that her doctor recommended the article and described, "I don't think he's making this up - - how the - - how the brain reacts to things that we inject into our body." The court noted that the author is "a board certified neurosurgeon." That claim is supported by the doctor's personal website. See <http://www.russellblaylockmd.com/> (accessed July 1, 2015). Dr. Blaylock was, in fact, a licensed doctor until his retirement from practice in 2006. See

<http://wwwapps.ncmedboard.org/Clients/NCBOM/Public/LicenseeInformation/Details.aspx?&EntityID=75203&PublicFile=1> (accessed July 1, 2015). The court noted that it would review the article by Dr. Blaylock because of his qualifications and references to studies, but that it would not consider any other information from the website.

Dr. Blaylock's website references neither scientific research nor peer-reviewed medical literature. Rather, the information contained in the article advances Dr. Blaylock's personal opinion that "the policy of giving numerous vaccinations to individuals, especially infants and small children, is shear [sic] idiocy." The website bears none of the requisite indicia of trustworthiness set forth in *Katt*. Moreover, the record lacks any evidence that Dr. Blaylock's credentials as a neurosurgeon would qualify him to render opinion testimony regarding the subjects of his website, including infectious diseases and immunology. We emphasize that the catch-all exception to the hearsay rule does not open the door to the introduction of anything a physician has to say. The other evidentiary rules governing the introduction of expert testimony (MRE 702, MRE 703 and MRE 707) make it plain that in the absence of an adequate foundation, an expert opinion lacks reliability. Mrs. Kagen brought forth no information supporting the reliability of Dr. Blaylock's website, and the circuit court erred by considering it for any purpose.

F. WAVE

The last document presented by Mrs. Kagen concerns the HPV vaccination, and was posted on the World Association for Vaccine Education (WAVE) website. <http://novaccine.com/specific-vaccines/human-papillomavirus-hpv-vaccines/> (accessed July 1, 2015). The circuit court completely failed to address this document at the hearing and made no record consideration of the document's admissibility in its written opinion and order. The document includes quotations from a CDC Genital HPV Infection Facts Sheet. It names doctors that have conducted studies, but does not provide references to those studies. The website also gives detailed information about the ingredients and other information related to Merck's Gardasil vaccine.

As the document was not addressed at the hearing, the circuit court did not question Mrs. Kagen regarding her knowledge of the organization. From its website, we discern that WAVE is not affiliated with a public or governmental institution:

> The World Association for Vaccine Education (WAVE) is globally focused, non-profit, educational institution advocating reformation of the mass vaccination systems. To this effect, WAVE provides an avenue for a public exchange of non-medical vaccine information, ideas and a continuously updated database of documents that concern vaccine risk and uselessness. It's intent is to redress the balance of information available to parents on vaccination issues, acknowledge people who experience vaccine reactions, and adamantly advocate and maintain freedom of choice. [*Id.*]

We have no ground to deem the document trustworthy and cannot affirm the circuit court's admission of it.

Ultimately, the court acted within its discretion in admitting the CDC and USDHHS information. However, the remaining six items proffered by Mrs. Kagen were patently inadmissible and the court committed serious legal error in considering them.

## II. ANALYTICAL ERRORS

In *Kagen I*, unpub op at 3, we described that a circuit court must evaluate each best-interest factor of MCL 722.23 deemed relevant to the particular issue in dispute. "[T]he court must 'make substantive factual findings.' " *Id.*, quoting *Pierron v Pierron*, 486 Mich 81, 91; 782 NW2d 480 (2010). We, in turn, must affirm the circuit court's decision "unless the trial judge made findings of fact against the great weight of the evidence," meaning that "the factual determination clearly preponderates in the opposite direction." *Pierron*, 486 Mich at 85 (quotation marks and citations omitted).

The circuit court correctly identified the best-interest factors relevant to its analysis: MCL 722.23(c) and (*l*). Under these factors, the court must consider:

(c) The capacity and disposition of the parties involved to provide the child with food, clothing, medical care or other remedial care recognized and permitted under the laws of this state in place of medical care, and other material needs.

* * *

(*l*) Any other factor considered by the court to be relevant to a particular child custody dispute.

As aptly noted by the court, "both parties are amply equipped to *provide* medical care to the minors, but differ philosophically as to *what* care to administer." (Emphasis in original.) The circuit court asserted that "both parties presented ample evidence as to the respective pros and cons of vaccinations and inoculations in general" but erred in concluding that "neither party presented evidence as to what specific vacations or inoculations are medically recommended, or not, for each respective minor."

The parties provided relatively equal amounts of information regarding the safety of vaccinations, although the volume of *admissible* evidence presented by Mr. Kagen surpassed that of Mrs. Kagen. Mr. Kagen presented information from the CDC regarding vaccine safety, recommendations, and side effects and risks, as well as debunking the vaccine-autism connection theory. The CDC-generated information included a list of studies conducted to examine the vaccine-autism connection. Mr. Kagen provided information from the FDA regarding the "types of vaccines that are routinely given to children," and the specific vaccinations (along with brand names) that are given on a regular basis. The FDA document included a description of the risks and benefits of the vaccines, common side effects, and conditions which contraindicate vaccination. Mr. Kagen's evidence from the NIH's National Center for Complementary and Alternative Medicine indicates that the agency "is the Federal Government's lead agency for scientific research on the diverse medical and health care systems, practices, and products that

are not generally considered part of conventional medicine." See <https://nccih.nih.gov/about> (accessed July 1, 2015).[2] The documents presented included several links to scientific literature and studies from well-known and respected sources and indicated that "[t]he value and safety of vaccinating children against dangerous illnesses cannot be overstated." Mr. Kagen provided a print-out from the MDCH website with hyperlinks to studies regarding vaccination safety.

Mrs. Kagen presented two admissible documents relevant to the debate, which presented duplicative information. The first is a document from vaccines.gov. The website "is the federal gateway to information on vaccines and immunizations" and is controlled by the National Vaccine Program Office within the USDHHS. <http://www.vaccines.gov/about.html> (accessed July 1, 2015). Mrs. Kagen specifically presented a list of possible side effects from various vaccinations. The document cautions:

> **Any vaccine can cause side effects.** For the most part these are minor (for example, a sore arm or low-grade fever) and go away within a few days. Listed below are vaccines licensed in the United States and side effects that have been associated with each of them. This information is copied directly from CDC's Vaccine Information Statements, which in turn are derived from the Advisory Committee on Immunization Practices (ACIP) recommendations for each vaccine.
>
> Remember, vaccines are continually monitored for safety, and like any medication, vaccines can cause side effects. However, a decision not to immunize a child also involves risk and could put the child and others who come into contact with him or her at risk of contracting a potentially deadly disease. [<http://www.vaccines.gov/basics/safety/side_effects/> (emphasis in original) (accessed July 1, 2015).]

Mrs. Kagen presented a substantively identical document, which opened with the exact quote as her first source, from the CDC. <http://www.cdc.gov/vaccines/vac-gen/side-effects.htm> (accessed July 1, 2015). These studies did reveal that some severe reactions had occurred following childhood vaccinations. For example, the DTaP (diphtheria, tetanus, acellular pertussis) vaccination had caused serious allergic reactions "in less than 1 out of a million doses." Seizures, coma, lowered consciousness, and permanent brain damage had also been reported but these reactions "are so rare it is hard to tell if they are caused by the vaccine." *Id.* These documents, while warning readers of the potential risks associated with vaccinations, reveal that severe and even moderate risks are rare and far outweighed by vaccine benefits.

A review of the parties' evidence clearly supports that vaccination of children is in their best interests, unless the child's medical condition contraindicates vaccination. The reports generated after public-agency research and investigation, including those presented by Mrs. Kagen, establish that the benefits associated with vaccination far outweigh any dangers. The

---

[2] The agency has since been renamed the National Center for Complementary and Integrative Health.

USDHHS and CDC documents advise that vaccine side effects are "[f]or the most part . . . minor" and caution that "a decision not to immunize a child . . . could put the child and others who come into contact with him or her at risk of contracting a potentially dangerous disease." We previously discussed the extreme rarity of "severe problems" arising from DTaP vaccination. Similarly, severe reactions to the MMR vaccination (measles, mumps, and rubella), such as deafness, brain damage, and coma, "are so rare that it is hard to tell whether they are caused by the vaccine." In relation to the Hepatitis B vaccination, the agencies describe that "[m]ore than 100 million people in the United States have been vaccinated" and "[s]evere allergic reactions were limited to one in 1.1 million doses." Other potential dangers noted by the agencies are irrelevant to the current case as they impact only young children. For example, the studies indicated that young children receiving the seasonal unactivated flu vaccine at the same time as receiving a pneumococcal vaccine "may be at an increased risk for seizures caused by fevers." See <http://www.vaccines.gov/basics/safety/side_effects/> (emphasis in original) (accessed June 22, 2015); <http://www.cdc.gov/vaccines/vac-gen/side-effects.htm> (accessed July 1, 2015).

Mrs. Kagen also expressed concern over impacts on the brain caused by vaccination. The article by Dr. Blaylock explains his theory regarding this causation mechanism. Even were it admissible, the article mentions no particular damage to older children receiving vaccinations. Mr. Kagen's evidence, on the other hand, includes several studies disproving the link between vaccinations and autism.

As to information specific to each child, the court expressed that she repeatedly asked the parties to present testimony from the children's pediatrician regarding "what vaccinations have already been administered, what specific vaccinations are recommended for each minor, and, whether administering vaccinations the minors have yet to receive is medically in their best, individual, interests."

Although the court had requested the parties to present the testimony of the children's pediatrician, Dr. Shah, the court ended the hearing by stating her intent to issue a subpoena. The court then failed to do so. In its written opinion and order, the court contended that it "abandoned pursuit of a *sua sponte* subpoena" after Mr. Kagen gave a news interview during which he asserted that he would be calling Dr. Shah "to testify at the continued [hearing] date." This timeline is inaccurate. The court reviewed Mr. Kagen's interview *before* the March 3, 2015 hearing, and only expressed an intent to sua sponte subpoena the doctor at the end of that hearing. Therefore, it would have been impossible for the court to abandon the idea before the hearing as stated in the opinion and order.

Moreover, contrary to the court's assertion, Mr. Kagen did present evidence regarding the vaccines the children had already received, at least in regard to the Kagens' oldest daughter, AK. At the original hearing before this Court's remand, Mr. Kagen presented the vaccination waiver forms Mrs. Kagen signed on AK's behalf. Each form indicated which vaccinations were recommended. As Mr. Kagen had taken AK to the health department for certain vaccinations during these proceedings, he presented updated records from the pediatrician's office. Those records indicated "that vaccinations are overdue and should be administered today if not medically contraindicated."

The court criticized Mr. Kagen's general request to subject the children to "the standard vaccinations." This left

> the court in a position to have to, essentially, guess which of the vaccinations and commonly administered inoculations [Mr. Kagen] believes are "standard." The court opines that a "one-size-fits-all" approach to judicial implementation of a course of medical treatment, i.e. implementation of adolescent vaccinations, is illogical, dangerous, and squarely opposite of this court's obligation in evaluating what is, or is not, in any child's best interests.

The court's logic is confounding. The court acknowledged that some vaccinations are "commonly administered" but failed to recognize that this is synonymous with "standard." As any parent can attest, pediatricians regularly give parents a list of the standard vaccinations along with a schedule of when they should be administered. Mr. Kagen did present evidence enumerating the standard vaccinations administered to children in the United States. The FDA article lists these vaccinations. And the letter from the children's pediatrician clearly enumerates which vaccinations AK had yet to receive and were recommended specifically for her. The same is true of the vaccination waiver forms earlier signed by Mrs. Kagen.[3]

While the court acknowledged that Mr. Kagen presented letters from the pediatrician's office indicating which vaccinations AK had yet to receive, the court noted that these letters recommended that the vaccinations "should be administered today if not medically contraindicated." At the hearing, the court recognized the meaning of this phrase: "every routinely administered vaccine for children that's listed ends with tell your healthcare provider beforehand if, and there are a number of things, if your child is ill, has swelling of the brain within seven days, had a previous dose of the vaccine, has a neurologic disorder, such as epilepsy, has had a reaction to a previous shot, et cetera." Yet, when the court issued its opinion and order, it seemed perplexed by the meaning of "medically contraindicated." The court reasoned:

> As both parties' evidence suggests, there is legitimate debate in the medical community as to the safety and necessity of certain commonly administered vaccinations. There was also not a scintilla of evidence presented to the court as to whether vaccinations the minors have yet to receive would otherwise be "medically contraindicated" for each child.

Ultimately, however, Mrs. Kagen never argued that the children had ever experienced an allergic reaction to a vaccine. No evidence supports that either child has a compromised immune system or a history of seizures counseling against the administration of vaccinations. Mrs. Kagen was not concerned that the children's health dictated against vaccination, but that vaccinations would endanger the children in the ways described in the inadmissible websites. The letter from the children's pediatrician, Dr. Shah, recommended vaccinating the Kagen

---

[3] The lower court record does not include medical documentation of the vaccinations received by the parties' younger daughter, JK.

children.  Had their medical conditions contraindicated vaccination, Dr. Shah would not have signed the missives.  This record contains no support whatsoever for the circuit court's factual finding that there exists in the medical community a "legitimate debate . . . as to the safety and necessity" of the vaccines recommended for the Kagen children.  Indeed, the evidence overwhelmingly preponderates in the opposite direction.  We therefore reverse the circuit court's order denying Mr. Kagen's motion to update the children's vaccinations.

To avoid prolonging this dispute, we direct the court to take specific actions on remand.  Mr. Kagen must request from the children's pediatrician separate letters regarding each child.  Each letter must list: (1) the vaccinations the child has received, (2) the dates of inoculation, (3) the vaccinations recommended at this time, and (4) the vaccinations recommended in the future.  Each letter should specifically state whether the administration of any vaccination is medically contraindicated.  If the vaccinations are not contraindicated, the letters should include an affirmative statement to that effect.

The circuit court shall enter an order directing the pediatrician's production of letters consistent with this Court's demand.  In any event, Mr. Kagen must present these letters to the circuit court within 21 days of the entry of this opinion.  The circuit court is directed to enter an order within 7 days of receiving those letters.  The order must direct that the children be subject to vaccinations in strict compliance with the pediatrician's letters.  The course of vaccination must begin within 21 days of the entry of the circuit court's order on remand.

We reverse and remand for further proceedings explicitly directed by this opinion.  We retain jurisdiction to ensure that the timeline outlined in this opinion is strictly followed.  Upon official notice from Mr. Kagen or his counsel that the course of vaccination has begun, this Court will enter an order releasing jurisdiction.

/s/ Peter D. O'Connell
/s/ Stephen L. Borrello
/s/ Elizabeth L. Gleicher

# Court of Appeals, State of Michigan

# ORDER

Lenore Kagen v Richard J Kagen

Docket No.   318459

LC No.   2010-779424-DM

Peter D. O'Connell
Presiding Judge

Stephen L. Borrello

Elizabeth L. Gleicher
Judges

---

Pursuant to the opinion issued concurrently with this order, this case is REMANDED for further proceedings consistent with the opinion of this Court. We retain jurisdiction.

Proceedings on remand in this matter shall commence within 14 days of the Clerk's certification of this order, and they shall be given priority on remand until they are concluded. As stated in the accompanying opinion, to avoid prolonging this dispute, we direct the court to take specific actions on remand. Mr. Kagen must request from the children's pediatrician separate letters regarding each child. Each letter must list: (1) the vaccinations the child has received, (2) the dates of inoculation, (3) the vaccinations recommended at this time, and (4) the vaccinations recommended in the future. Each letter should specifically state whether the administration of any vaccination is medically contraindicated. If the vaccinations are not contraindicated, the letters should include an affirmative statement to that effect.

The circuit court shall enter an order directing the pediatrician's production of letters consistent with this Court's demand. In any event, Mr. Kagen must present these letters to the circuit court within 21 days of the entry of this opinion. The circuit court is directed to enter an order within 7 days of receiving those letters. The order must direct that the children be subject to vaccinations in strict compliance with the pediatrician's letters. The course of vaccination must begin within 21 days of the entry of the circuit court's order on remand. The proceedings on remand are limited to this issue.

The parties shall promptly file with this Court a copy of all papers filed on remand. Within 7 days after entry, appellant shall file with this Court copies of all orders entered on remand.

The transcript of all proceedings on remand shall be prepared and filed within 21 days after completion of the proceedings.

A true copy entered and certified by Jerome W. Zimmer Jr., Chief Clerk, on

JUL 1 4 2015

Date

Chief Clerk