*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

VINCENT JOHNSON, PISTON GROUP, LLC, PISTON AUTOMOTIVE, LLC, DETROIT THERMAL SYSTEMS, LLC, IRVIN AUTOMOTIVE PRODUCTS, LLC, and AIREA, INC.,

        Plaintiffs-Appellees,

v

MICHIGAN MINORITY PURCHASING COUNCIL, doing business as MICHIGAN MINORITY SUPPLIER DEVELOPMENT COUNCIL,

        Defendant-Appellant,

and

MICHELLE ROBINSON,

        Defendant.

FOR PUBLICATION
March 3, 2022
9:00 a.m.

No. 357979
Wayne Circuit Court
LC No. 21-006110-CB

Before: RICK, P.J., and MURRAY and SHAPIRO, JJ.

MURRAY, J.

Defendant, the Michigan Minority Purchasing Council, doing business as the Michigan Minority Supplier Development Council (MMSDC), appeals by leave granted[1] the circuit court's July 8, 2021 order granting the motion for a preliminary injunction filed by plaintiffs, Piston Automotive, LLC, Detroit Thermal Systems, LLC, Irvin Automotive, LLC, and AIREA, Inc. (collectively, the Piston Companies), Piston Group, LLC (Piston Group), and Vincent Johnson.

---

[1] *Johnson v Mich Minority Purchasing Council*, unpublished order of the Court of Appeals, entered September 29, 2021 (Docket No. 357979).

-1-

Because of the great discretion afforded the circuit court on these equity-based decisions, and our concomitant circumscribed standard of review, we affirm.

## I. FACTUAL BACKGROUND

Johnson, a black male, is the sole owner of the Piston Group and its Chief Executive Officer and Chairman of the Board of Directors. The Piston Companies are subsidiaries of the Piston Group. Johnson owns and controls 100% of the Piston Group, Piston Automotive, Irvin Automotive, and AIREA. Johnson has a 51% ownership and controlling interest in Detroit Thermal Systems.

The MMSDC is a regional affiliate of the National Minority Supplier Development Council (NMSDC), which is a nonprofit corporate membership organization that facilitates business dealings between minority business enterprises (MBEs) and a network of corporate members. Robinson is the MMSDC's president and Chief Executive Officer. MBE certification is the process by which a business is verified as being minority-owned, managed, and controlled according to the criteria set forth by the NMSDC. In order to receive or maintain MBE certification, the NMSDC requires that an entity must be a for-profit business located in the United States that is at least 51% owned, controlled, and managed on a day-to-day basis by minority group members.

Each of the Piston Companies have for years been certified as MBEs by the MMSDC.[2] The Piston Group has never sought MBE certification. Until 2020, the MMSDC certified each of the renewal applications submitted on behalf of the Piston Companies. As part of the applications, Johnson executed affidavits attesting that each of the Piston Companies were "at least fifty-one percent (51%) owned by one or more minority individuals . . . and such individuals control, operate and manage the company." Each of the affidavits contained the following provision:

> The undersigned hereby agrees (agree) to hold [the MMSDC] free and harmless from any and all claims, demands, and damages whatsoever arising out of the presentation of this application and agrees to indemnify and hold [the MMSDC] harmless for any and all liability in connection with the certification of the information contained in this application.

In December 2019 and January 2020, the MMSDC was informed that Amit Singhi, the Asian-American Chief Organizational Officer and Chief Financial Officer of the Piston Group, would soon be leaving the company. In February 2020, Robinson requested a meeting with Singhi and Johnson to discuss the organizational structure of the Piston Companies. Before any meetings were held, the Piston Group announced that Gordon Fournier, a white male, had been named as its COO and CFO. Following multiple delays, in March 2020 Robinson and Johnson met to discuss the organizational structures of the Piston Companies. Following the meeting, the MMSDC reviewed the Piston Companies' eligibility for continued MBE certification, and in May of that same year, the MMSDC determined that Irvin Automotive and AIREA did not qualify for MBE

---

[2] Piston Automotive was first certified as an MBE in 1995, AIREA in 2001, Detroit Thermal Systems in 2013, and Irvin Automotive in 2017.

certification because they were not managed on a day-to-day basis by one or more minority group members. The MMSDC also concluded that Piston Automotive and Detroit Thermal Systems qualified for MBE certification.

Six months later, Clarence Oliver, the head of certification and MBE services for the MMSDC, advised Johnson that the MMSDC would conduct an audit and recertification process for the Piston Companies. Then, in January 2021, the MMSDC informed Johnson that, although the Piston Companies were owned and controlled by a minority group member, none of the companies were managed on a day-to-day basis by one or more minority group members. The Piston Companies filed an appeal with the MMSDC appeals committee, and the appeals committee upheld the MMSDC's decision.

Plaintiffs then filed a complaint alleging counts of tortious interference with a business relationship, negligence, declaratory relief, and defamation. Plaintiffs also sought a preliminary injunction reinstating each of the Piston Companies' MBE certifications and overruling the MMSDC's decertification decision pending the outcome of the case. Following a hearing, the circuit court issued a written opinion and entered an order granting plaintiffs' motion for a preliminary injunction. This appeal followed.[3]

## II. ANALYSIS

The MMSDC argument that the circuit court abused its discretion when it granted plaintiffs' motion for a preliminary injunction attacks the court's opinion on all fronts. Specifically, it challenges both the court's legal conclusions and perceived legal omissions within the opinion, as well as the circuit court's analysis of the relevant factors, and ultimate conclusion.

## A. STANDARDS OF REVIEW

"[A] trial court's decision to grant injunctive relief is reviewed for an abuse of discretion." *Dep't of Environmental Quality v Gomez*, 318 Mich App 1, 32; 896 NW2d 39 (2016) (citations omitted). "An abuse of discretion occurs when the court's decision falls outside the range of reasonable and principled outcomes." *Id*. at 33-34 (quotation marks and citation omitted). This Court reviews a trial court's interpretation and application of a contract de novo. *Yoches v Dearborn*, 320 Mich App 461, 479; 904 NW2d 887 (2017) (citation omitted).

## B. PRELIMINARY INJUNCTION

"[I]njunctive relief is an extraordinary remedy that issues only when justice requires, there is no adequate remedy at law, and there exists a real and imminent danger of irreparable injury." *Davis v City of Detroit Fin Review Team*, 296 Mich App 568, 613-614; 821 NW2d 896 (2012) (quotation marks and citation omitted). "The purpose of a preliminary injunction is to preserve the status quo pending a final hearing regarding the parties' rights." *Hammel v Speaker of House of Reps*, 297 Mich App 641, 647; 825 NW2d 616 (2012) (quotation marks and citation omitted).

---

[3] We expedited the appeal. *Johnson v Mich Minority Purchasing Council*, unpublished order of the Court of Appeals, entered November 22, 2021 (Docket No. 357979).

The moving party has the burden of demonstrating that a preliminary injunction should be issued. MCR 3.310(A)(4); *Hammel*, 297 Mich App at 648. When determining whether to grant a preliminary injunction, the trial court should consider:

> (1) the likelihood that the party seeking the injunction will prevail on the merits, (2) the danger that the party seeking the injunction will suffer irreparable harm if the injunction is not issued, (3) the risk that the party seeking the injunction would be harmed more by the absence of an injunction than the opposing party would be by the granting of the relief, and (4) the harm to the public interest if the injunction is issued. [*Id*. at 648 (citation omitted).]

"[A] preliminary injunction should not issue where an adequate legal remedy is available." *Pontiac Fire Fighters Union Local 376 v City of Pontiac*, 482 Mich 1, 9; 753 NW2d 595 (2008). "The mere apprehension of future injury or damage cannot be the basis for injunctive relief." *Id*.

## 1. LIKELIHOOD OF SUCCESS ON THE MERITS

Before turning to an analysis of plaintiffs' likelihood of success on the merits of their separate claims, we will first address the over-arching argument that plaintiffs cannot prevail—or at least are not likely to succeed on the merits—because plaintiffs signed a release with each application for MBE certification.

## A. RELEASE

The parties dispute whether plaintiffs' claims would be barred by the provisions contained in the certified minority status affidavits executed by Johnson as part of the applications for MBE certification. The trial court determined that the provision in the certified minority status affidavits did not constitute releases of liability, but instead ruled that the provision "impose[d] clear and unequivocal indemnification obligations on the applicant in the event that [d]efendants face liability to third-parties arising out of the certification of the application."

It is well-settled that a cause of action may be barred, under MCR 2.116(C)(7), where a valid release of liability exists between the parties. *Xu v Gay*, 257 Mich App 263, 266; 668 NW2d 166 (2003). "A release of liability is valid if it is fairly and knowingly made." *Wyrembelski v St. Clair Shores*, 218 Mich App 125, 127; 553 NW2d 651 (1996). "The validity of a release turns on the intent of the parties." *Batshon v Mar-Que Gen Contractors, Inc*, 463 Mich 646, 649 n 4; 624 NW2d 903 (2001). "If the text of the release is unambiguous, the parties' intentions must be ascertained from the plain, ordinary meaning of the language of the release," *Collucci v Ekland*, 240 Mich App 654, 658; 613 NW2d 402 (2000), with that plain language being enforced by the court. *Bayberry Group, Inc v Crystal Beach Condo Ass'n*, 334 Mich App 385, 393; 964 NW2d 846 (2020). We also must be careful to avoid "interpretations that would render any part of the document surplusage or nugatory." *Id*. (quotation marks and citation omitted).

We conclude that the circuit court read the provision too narrowly, and was not in accord with the plain language of the document. Specifically, the circuit court's interpretation limited the language to provide only an indemnity provision, which renders surplusage or nugatory the provisions providing that the applicant agreed "to hold [the MMSDC] free and harmless from any and all claims, demands, and damages whatsoever arising out of the presentation" of the

applications. This agreement to hold MMSDC "free and harmless from any and all claims …" is separate and apart from the agreement to "indemnify and hold harmless [the MMSDC] for any and all liability in connection with the certification of the information contained in" the applications. Black's Law Dictionary defines the term "hold harmless" as "[t]o absolve (another party) from any responsibility for damage or other liability arising from the transaction," *Black's Law Dictionary* (11th ed), and defines the term "indemnify" as to "reimburse (another) for a loss suffered because of a third party's or one's own act or default[,]" to "promise to reimburse (another) for such a loss[,]" or to "give (another) security against such a loss." *Black's Law Dictionary* (11th ed).

Thus, under the plain and ordinary meaning of the provisions, plaintiffs not only agreed to absolve defendants from any and all responsibility for damage or other liability arising from the presentation of the applications and certification of the information, but also agreed to indemnify defendants for third-party liability arising out of that same conduct. As such, the circuit court erred when it determined that the provision was limited to an indemnity clause, as it also contained an unambiguous provision providing that plaintiffs would hold defendants "free and harmless from any and all claims" associated with the applications. See *Youches*, 320 Mich App at 479 ("A hold-harmless agreement is an indemnity contract, which is, in essence, a release of liability.") (citation omitted), *Hecht v National Heritage Academies*, 499 Mich 586, 627 n 88; 886 NW2d 135 (2016) (citing the Black's Law Dictionary definition of "hold-harmless" and recognizing that the hold-harmless provision could arguably preclude plaintiff from any recovery against defendant), and *Hall v Small*, 267 Mich App 330, 332-333; 705 NW2d 741 (2005)(treating a hold-harmless provision in a real estate contract as a release). Although we come to no definitive conclusion as to the coverage of the agreement, the hold-harmless provision could greatly inhibit plaintiffs' chances of establishing a substantial likelihood of success on the merits of their claims. Nevertheless, we turn to a brief examination of plaintiffs' specific claims.[4]

## B. TORTIOUS INTERFERENCE

In their complaint, plaintiffs first alleged that the MMSDC and Robinson tortiously interfered with plaintiffs' business relationships by rescinding the Piston Companies' MBE certifications.

> The elements of tortious interference with a business relationship or expectancy are (1) the existence of a valid business relationship or expectancy that is not necessarily predicated on an enforceable contract, (2) knowledge of the relationship

---

[4] A trial court is required to examine and evaluate four criteria before deciding whether to grant preliminary injunctive relief. *Thermatool Corp v Borzym*, 227 Mich App 366, 376; 575 NW2d 334 (1998) (Indicating that the court "must" address the four injunction factors). The circuit court's opinion did not address, for purposes of the likelihood of success factor, any of plaintiffs' separate claims, but instead solely focused on the effect of the hold-harmless provision. The court should have also analyzed the likelihood of success on each of the claims, and the failure to have done so could, in some cases, result in an abuse of discretion. *Id.* See also *International Molders' and Allied Workers' Local Union 164 v Nelson*, 799 F2d 547, 551 (CA 9, 1986) (A court abuses its discretion in issuing a preliminary injunction when it fails to consider the relevant factors).

or expectancy on the part of the defendant interferer, (3) an intentional interference by the defendant inducing or causing a breach or termination of the relationship or expectancy, and (4) resulting damage to the party whose relationship or expectancy was disrupted. [*Health Call of Detroit v Atrium Home & Health Care Servs, Inc*, 268 Mich App 83, 90; 706 NW2d 843 (2005) (citations omitted).]

"[T]o satisfy the third element, the plaintiff must establish that the defendant acted both intentionally and either improperly or without justification." *Puetz v Spectrum Health Hosps*, 324 Mich App 51, 78; 919 NW2d 439 (2018) (quotation marks and citation omitted). The plaintiff must also establish that "the interferer did something illegal, unethical or fraudulent." *Dalley v Dykema Gossett*, 287 Mich App 296, 324; 788 NW2d 679 (2010) (quotation marks and citation omitted).

As noted, the circuit court failed to address the elements of plaintiffs' tortious interference with a business relationship claim. In regard to the first element, the evidence indicated that plaintiffs had valid business relationships or expectancies that were impacted by the Piston Companies' MBE statuses. Johnson attested that MBE certification and inclusion on the NMSDC's corporate database allowed the Piston Companies to shift their business base to become less dependent on original equipment manufacturers (OEMs). Johnson also attested that Ford Motor Company and Stellantis Corporation account for 75% of the Piston Companies' sales portfolio, and both companies advertise their commitment to utilizing diverse suppliers. Most notably, Johnson attested that the Piston Companies are in the process of renewing their contracts with Stellantis, which are contingent on MBE certification.

In regard to the second element, the evidence indicated that defendants had knowledge of the business relationships or expectancies that were impacted by the Piston Companies' MBE statuses. The MMSDC's stated mission is to advance business opportunities for certified MBEs and connect them to corporate members. Additionally, in April 2020, Robinson told Johnson in an e-mail that "[n]o one has an absolute right to certification as our board and your customers recently confirmed and unanimously supported." Robinson's statement regarding defendants' customers indicates that defendants had knowledge of the business relationships or expectancies that could be impacted by the Piston Companies' MBE statuses.

The evidence is equivocal as to whether defendants acted with the intent to cause a breach or termination of plaintiffs' business relationships or expectancies, but nothing in the limited record indicates that defendants did something illegal, unethical, or fraudulent. The MMSDC rescinded the Piston Companies' MBE certifications after Singhi, the Piston Group's COO and CFO, was replaced by Fournier, a white male. The MMSDC's certification letter provided that the Piston Companies' applications for certification listed Fournier as an officer of AIREA, Piston Automotive, and Irvin Automotive, although the organizational charts for each entity omitted Fournier. The MMSDC's certification letter also provided that three of the four officers for AIREA were nonminorities, three of the four officers for Piston Automotive were nonminorities, two of the four officers for Irvin Automotive were nonminorities, and the president and COO of Detroit Thermal Systems was a nonminority.

Although plaintiffs disagree with the MMSDC's determination regarding the day-to-day management of the Piston Companies, and even if the determination was incorrect, the evidence

does not indicate that defendants acted with the intent to cause a breach or termination of plaintiffs' business relationships or expectancies, and nothing indicates that defendants did something illegal, unethical, or fraudulent. Johnson stated in his affidavit that the MMSDC actually decertified the Piston Companies because the Piston Group declined to contribute funds to the MMSDC in 2018, declined to participate in the MMSDC golf outing in 2019, and declined to pre-pay for a sponsorship of the MMSDC's 2020 gala. However, the documentary evidence indicates that a change in personnel prompted the decertification. Because the evidence does not indicate one way or the other that defendants acted with the intent to cause a breach or termination of plaintiffs' business relationships or expectancies, and nothing indicates that defendants did something illegal, unethical, or fraudulent, plaintiffs are unlikely to succeed on the merits of their tortious interference with a business relationship claim.

## C. NEGLIGENCE

The circuit court also failed to address the elements of plaintiffs' negligence claim. To establish a prima facie case of negligence, a plaintiff must satisfy the following elements: "(1) the defendant owed the plaintiff a legal duty, (2) the defendant breached the legal duty, (3) the plaintiff suffered damages, and (4) the defendant's breach was a proximate cause of the plaintiff's damages." *Powell-Murphy v Revitalizing Auto Communities Environmental Response Trust*, 333 Mich App 234, 243; 964 NW2d 50 (2020) (citation omitted). The common law imposes on "every person engaged in the prosecution of any undertaking an obligation to use due care, or to so govern his actions as not to unreasonably endanger the person or property of others." *Id*. at 243-244 (quotation marks and citation omitted).

Here, defendants owed plaintiff a duty to exercise due care in determining whether the Piston Companies qualified for MBE certification.[5] The evidence in the current record suggests that defendants likely did not breach this duty. In his affidavit, Johnson attested that he met with Robinson in April 2020 in order to address the Piston Companies' MBE certifications. According to Johnson, he explained to Robinson that he made all major decisions for the Piston Group and the Piston Companies. and that Singhi was not an executive officer for any of the Piston Companies such that Singhi's departure should not have affected the Piston Companies' MBE certification status. Notwithstanding this evidence, the MMSDC's certification letter indicates that the MMSDC reviewed the Piston Companies' applications for certification and determined that the Piston Companies were not managed on a day-to-day basis by minority group members. The certification letter provided that the MMSDC reviewed the Piston Companies' organizational structures, ownership and tax return documentation, board and shareholder documents, reporting structures, boards of directors and authority, company officers, and day-to-day management responsibilities. Based upon this information, the MMSDC determined that three of the four officers for AIREA were non-minorities, three of the four officers for Piston Automotive were non-minorities, two of the four officers for Irvin Automotive were non-minorities, and the president and COO of Detroit Thermal Systems was a non-minority. Thus, the MMSDC

---

[5] If a party fails to perform a service contract in a skillful and workmanlike manner, then the other party may have a cause of action for negligence or breach of contract. See e.g., *Clark v Dalman*, 379 Mich 251, 261; 150 NW2d 755 (1967).

concluded that the Piston Companies were not managed on a day-to-day basis by minority group members. Following this determination, plaintiffs appealed, and the MMSDC appeals committee upheld the MMSDC's previous decision to rescind the MBE certifications for the Piston Companies. Based upon this evidence, the MMSDC does not appear to have breached its duty to exercise due care in determining whether the Piston Companies qualified for MBE certification. Thus, plaintiffs are unlikely to succeed on the merits of their negligence claim.

## D. DEFAMATION

The circuit court also failed to address the elements of plaintiffs' defamation claim. In order to establish a defamation claim, a plaintiff must prove:

> (1) a false and defamatory statement concerning the plaintiff, (2) an unprivileged communication to a third party, (3) fault amounting at least to negligence on the part of the publisher, and (4) either actionability of the statement irrespective of special harm (defamation per se) or the existence of special harm caused by publication. [*Ghanam v Does*, 303 Mich App 522, 544; 845 NW2d 128 (2014) (quotation marks and citations omitted).]

"A communication is defamatory if, under all the circumstances, it tends to so harm the reputation of an individual that it lowers the individual's reputation in the community or deters others from associating or dealing with the individual." *Kefgen v Davidson*, 241 Mich App 611, 617; 617 NW2d 351 (2000) (citations omitted). "Privilege can be used as a defense in a defamation action." *Bedford v Witte*, 318 Mich App 60, 65; 896 NW2d 69 (2016) (citation omitted). "The elements of a qualified privilege are (1) good faith, (2) an interest to be upheld, (3) a statement limited in its scope to this purpose, (4) a proper occasion, and (5) publication in a proper manner and to proper parties only." *Prysak v RL Polk Co*, 193 Mich App 1, 15; 483 NW2d 629 (1992) (citations omitted). "A plaintiff may overcome a qualified privilege only by showing that the statement was made with actual malice, i.e., with knowledge of its falsity or reckless disregard of the truth." *Id*. (citation omitted).

Plaintiffs are unlikely to succeed on their assertion that the rescission of the Piston Companies' MBE certifications and removal of the Piston Companies from the NMSDC's online database constitutes defamation. The MMSDC is a nonprofit corporate membership organization that facilitates business dealings between MBEs and a network of corporate members, with a mission to advance business opportunities for certified MBEs and connect them to corporate members. Thus, MBEs are included in the NMSDC's corporate database, which attracts potential customers. The limited record establishes that any communications were made in good faith and in furtherance of the MMSDC's mission, or were made for the proper purpose of informing corporate members of the Piston Companies' MBE statuses, were made after the certification and appellate processes were complete, and were published to the MMSDC's corporate members on the NMSDC's corporate database. Accordingly, the rescission of the Piston Companies' MBE certifications and removal of the Piston Companies from the NMSDC's online database were communications that conveyed accurate information, at least as far as can be determined at this juncture. Again, the MMSDC concluded that the Piston Companies did not qualify for MBE status after the certification and appellate processes were complete. The MMSDC justified its findings in its certification letter, thereby indicating that communications regarding the findings were not

made with actual knowledge of their falsity or reckless disregard for their truth. If it turns out at the end of litigation that the assessment of who runs the day-to-day operations of the Piston Companies is Johnson, i.e., that MMSDC was incorrect, plaintiff will still need to prove that the denials were not implemented in good faith, and the record is not sufficiently developed to show a substantial likelihood of success in that regard.[6]

## E. DECLARATORY RELIEF

Finally, plaintiffs have not shown a substantial likelihood of success on the merits of their claim for declaratory relief, though it is more of a close call than it was on plaintiffs' other claims. "In a case of actual controversy within its jurisdiction, a Michigan court of record may declare the rights and other legal relations of an interested party seeking a declaratory judgment, whether or not other relief is or could be sought or granted." MCR 2.605(A)(1). "An actual controversy exists when declaratory relief is needed to guide a plaintiff's future conduct in order to preserve the plaintiff's legal rights." *Lansing Sch Ed Ass'n v Lansing Bd of Ed* (*On Remand*), 293 Mich App 506, 515; 810 NW2d 95 (2011) (quotation marks and citation omitted).

Plaintiffs sought a declaratory judgment providing that the Piston Companies each qualified for MBE certification. Again, the MMSDC's certification letter indicates that the Piston Companies are not managed on a day-to-day basis by minority group members, and that in making the determination the MMSDC reviewed the Piston Companies' organizational structures, ownership and tax return documentation, board and shareholder documents, reporting structures, boards of directors and authority, company officers, and day-to-day management responsibilities. Notwithstanding this evidence, plaintiffs argue that each of the Piston Companies were managed on a day-to-day basis by Johnson. The extent of management involvement to satisfy MMSDC's criteria of "a day-to-day basis" is not clear from the evidence.

Nevertheless, in their affidavits, officers and presidents of the Piston Companies attested to Johnson's involvement in each of the Piston Companies. Most notably, Fournier attested that Johnson engages in strategy development, operational execution, financial and business planning process optimization, internal environmental control, and talent management. Such activities include approving budgets and capital expenditures in excess of $1,000,000, participating in the board of directors meetings, participating in certain customer meetings, conducting strategic reviews, and approving personnel decisions for those that report directly to the officers and presidents of the Piston Companies. This evidence could indicate that Johnson does not manage the Piston Companies on a day-to-day basis because the decisions seem to be more high-level operational ones, yet depending on the definition used, the duties he performs could well meet that requirement. After all, whatever definition is used, one cannot expect a corporate officer to be involved in lower management or non-management decisions that are made on a daily basis to

---

[6] This is not meant to discount the evidence plaintiffs presented about possible alternative bases for the denial of the MBE certifications, as plaintiffs did present some evidence that could cause a reasonable person to question whether the denials were for the reasons stated by MMSDC, or for more retaliatory reasons unrelated to the make-up of the corporate hierarchy.

keep the company functioning. Whether plaintiffs can succeed on the merits of their claim for declaratory relief is a 50-50 proposition.

Aside from addressing the hold-harmless provision, the circuit court focused its attention on the equitable considerations, concluding that certain evidence "cast doubt upon Defendants' explanation for their change in position regarding the member entities." And combining that doubt about the ultimate certification decisions with the potential damage to the Piston Companies bottom line and corporate good will, the court concluded the preservation of the status quo was required. We now turn to those considerations.

## 2. IRREPARABLE HARM

"A particularized showing of irreparable harm is an indispensable requirement to obtain a preliminary injunction." *Pontiac Fire Fighters Union Local 376*, 482 Mich at 9 (quotation marks, citation, and ellipses omitted). "The mere apprehension of future injury or damage cannot be the basis for injunctive relief." *Id*. (citation omitted).

Johnson attested that MBE certification and inclusion on the NMSDC's Corporate Plus database allowed the Piston Companies to shift their business base to become less dependent on OEMs. Johnson also attested that Ford and Stellantis account for 75% of the Piston Companies' sales portfolio, and both companies advertise their commitment to utilizing diverse suppliers. Most notably, Johnson attested that the Piston Companies are in the process of renewing their contracts with Stellantis, which are contingent on MBE certification. Although plaintiffs failed to present any evidence that the Stellantis or Ford business opportunities will be lost without MBE certification, Johnson's testimony that certification is a contingency to contracting with Stellantis supports the trial court's conclusion that plaintiffs could suffer losses, but financial losses are not irreparable damages. *Pontiac Fire Fighters*, 482 Mich at 9.

However, as the circuit court recognized, loss of good will can constitute irreparable harm. *Slis v Michigan*, 332 Mich App 312, 362-363; 956 NW2d 569 (2020). Here, plaintiffs submitted evidence that 75% of the total sales amongst the Piston Companies resulted from two clients, Ford and Stellantis, and both preferred or required MBE certification. And, the negotiation of new contracts with Stellantis was imminent. These factors, and the reputation of the Piston Companies being held out as MBE certified for many years, were sufficient to support the conclusion that plaintiffs could suffer loss of goodwill in the absence of an injunction. *Id*.

## 3. BALANCE OF HARDSHIPS

On balance, and as the circuit court found, there is a risk that plaintiffs would suffer greater harm by the absence of an injunction than the defendants would suffer if injunctive relief were granted. Again, Johnson's testimony establishes that there is at least a risk that plaintiffs would suffer harm by the absence of an injunction. In comparison, injunctive relief presents relatively minor harm to the MMSDC. While the MMSDC has an interest in advancing its mission of facilitating business dealing between what it construes to be legitimate MBEs and a network of corporate members, the MMSDC suffers only minor harm by certifying the Piston Companies as MBEs while this litigation continues. After all, in the right case, that is the purpose of injunctive relief—place the parties in the status quo and let the judicial process resolve the dispute, without

one party suffering harm that cannot later be remedied. And here the Piston Companies had attained MBE status for years prior to the revocation of MBE certification. Furthermore, plaintiffs agreed to indemnify the MMSDC for third-party liability arising out of the certification of information contained in the applications for MBE certification.

### 4. PUBLIC INTEREST

The issuance of a preliminary injunction would not significantly harm the public interest. On appeal, the MMSDC contends that the preliminary injunction significantly harmed the public interest because it violated defendants' constitutional rights to freedom of speech and freedom of association. While it is true that "it is always in the public interest to prevent the violation of a party's constitutional rights," *Liberty Coins, LLC v Goodman*, 748 F 3d 682, 690 (CA 6, 2014), as explained below we do not take up these unpreserved arguments, and thus cannot conclude whether the injunction violates defendants' First Amendment rights. As there is no other indication that a preliminary injunction affecting the MMSDC, a private entity, significantly harms the public interest, the circuit court's findings on this factor cannot be disturbed.

### C. FREEDOM OF SPEECH AND FREEDOM OF ASSOCIATION

The MMSDC argues for the first time on appeal that the preliminary injunction violated the MMSDC's right to freedom of speech and freedom of association. For an issue to be preserved for appellate review, it must be raised in the trial court. *Glasker-Davis v Auvenshine*, 333 Mich App 222, 227; 964 NW2d 809 (2020). "[I]ssue preservation requirements only impose a general prohibition against raising an issue for the first time on appeal." *Id.* (citation omitted). This Court reviews unpreserved constitutional issues for plain error affecting a litigant's substantial rights. *Bay Co Prosecutor v Nugent*, 276 Mich App 183, 193; 740 NW2d 678 (2007). "To avoid forfeiture under the plain error rule, three requirements must be met: 1) the error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights." *Kern v Blethen-Coluni*, 240 Mich App 333, 336; 612 NW2d 838 (2000). Plain error affects a litigant's substantial rights if the party is prejudiced by the error, meaning that the error affected the outcome of the lower court proceedings. *Duray Dev, LLC v Perrin*, 288 Mich App 143, 150; 792 NW2d 749 (2010).

This Court will generally decline to address unpreserved issues unless a miscarriage of justice will result from a failure to pass on them, the question is one of law and all the facts necessary for its resolution have been presented, or it is necessary for a proper determination of the case. *Autodie, LLC v Grand Rapids*, 305 Mich App 423, 431; 852 NW2d 650 (2014). Furthermore, this Court has stated that it "will not reach constitutional issues if cases may be resolved on other grounds." *Pythagorean, Inc v Grand Rapids Twp*, 253 Mich App 525, 527; 656 NW2d 212 (2002) (citation omitted). Here, neither constitutional argument pressed on appeal were raised in the trial court.[7] We also do not see the necessity of addressing new arguments on

---

[7] We recognize that the injunction had not yet been entered when the arguments against its issuance were being made, but to preserve these arguments defendants should have at least argued the potential impact the injunction would have on their rights.

appeal when there was no evidentiary hearing held, and thus no findings of fact to review, and the injunction requires defendants to temporarily do what they had done for many years.

## III.  CONCLUSION

We are not blind to the uniqueness of affirming a preliminary injunction when we have concluded that most of plaintiffs' claims will not likely succeed on the merits, or all may be barred by a hold-harmless provision.  But we are also cognizant that much deference is given on appeal to a circuit court's decision to grant or deny the extraordinary equitable relief of a preliminary injunction.  Importantly, the four factors governing consideration of injunctive relief are meant to "simply guide the discretion of the court; they are not meant to be rigid and unbending requirements." *McPherson v Michigan High Sch Athletic Ass'n, Inc*, 119 F3d 453, 459 (CA 6, 1997) (en banc) (citation omitted).  And, when we apply that deference and conclude that the court's discretion was not abused in its analysis of three of the four factors, we feel compelled to affirm this highly discretionary decision, and trust that the circuit court will handle the case with the attention, efficiency, and timeliness required when a preliminary injunction has been issued. See MCR 3.310(A)(5) (except when two limited exceptions apply, a trial must be held within six months of the preliminary injunction).

Affirmed.

/s/ Christopher M. Murray
/s/ Michelle M. Rick