*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

KHALED ZAKHARIA and MARAL ZAKHARIA,

       Plaintiffs-Appellants,

and

WALEED ZAKHARIA, NABIL ZAKHARIA, and
PETRA ZAKHARIA,

       Plaintiffs,

v

MICHIGAN MONTESSORI INTERNATIONALE,
INC., JOSEPH WOOD, AUTUMN ROMIG, and
CHRISTINE RUSSELL,

       Defendants-Appellees.

UNPUBLISHED
October 27, 2025
2:03 PM

No. 369047
Ingham Circuit Court
LC No. 2023-000013-CK

KHALED ZAKHARIA and MARAL ZAKHARIA,

       Plaintiffs-Appellants,

v

MICHIGAN MONTESSORI INTERNATIONALE,
INC. and TIANNA DART,

       Defendants-Appellees.

No. 372364
Ingham Circuit Court
LC No. 2023-000863-CZ

Before: SWARTZLE, P.J., and ACKERMAN and TREBILCOCK, JJ.

PER CURIAM.

-1-

"When a party comes to us with nine grounds for reversing the [trial] court, that usually means there are none." *Fifth Third Mtg Co v Chicago Title Ins Co*, 692 F3d 507, 509 (CA 6, 2012). In over 160 pages of briefing, plaintiffs Khaled and Maral Zakharia offer nearly twice that. In this dispute with the private school that expelled their children because of Khaled's conduct, we affirm the trial court's grant of summary disposition to defendants[1] but reverse its award of sanctions.

## I. FACTS

Defendant Michigan Montessori Internationale operates a private school in Okemos known as Montessori Radmoor. Plaintiffs' children went to school at Radmoor. Beginning in 2021, Khaled became increasingly agitated about various policies at Radmoor. In July 2021, he emailed defendant Joseph Wood—Radmoor's "Head of School"—expressing concern about yoga being part of the physical education curriculum as potentially being incompatible with his family's Catholic faith. He also had concerns about the school's policies on masks as a Covid-19 mitigation measure, and in particular, he objected to his son wearing them even if masks were optional. In subsequent emails with his son's teacher, defendant Christine Russell, Khaled noted that while he had "communicated very clearly with [his son] on this issue many times that he should take off his mask while outside" at recess, his son was both confused about the rules and felt "implicit peer pressure" from classmates choosing to wear masks outdoors.

Over the course of the fall, Khaled became increasingly frustrated with his son choosing to wear a mask at school. He expressed increasing interest in school staff enforcing his wish that his son not wear a mask during recess outdoors. Khaled began coming to the school to monitor his son during recess and ensure that he did not put on a mask. At times Khaled entered the playground area to demand that his son turn over the mask he was wearing. Wood emailed Khaled and told him this was against the rules, and that if he needed to speak to his children during the school day he should come to the front desk and have his children brought to him there. Khaled took to picking up a younger daughter at noon and having a picnic with her in an area where he could observe his son during recess.

While monitoring the playground goings-on, Khaled began developing a separate set of concerns over his son's interactions with another student at the school going into the autumn of 2022. Both Khaled and Maral testified at their depositions that their son had told them he was being belittled by this classmate; apparently the Zakharias' son was unfamiliar with NBA legend Michael Jordan, perhaps on account of being a preteen born nearly a decade after Jordan retired. Wood investigated, although he concluded that Khaled's son had "initiated some of the interactions by calling the other child stupid." When Wood emailed Khaled these findings, Khaled was not happy. He insisted that any outbursts from his son were due to being "so pent up, having endured months of bullying." He asserted that his son's classmate "has an ability to quickly lie,

---

[1] As a result, we need not reach plaintiffs' argument challenging the trial court's handling of a protective order under MCR 2.302(C). With no further proceedings on remand, the issue is moot.

deflect or deny any wrong-doing until he is pinned down to the point where there's no escape" and "has a lot of experience in setting traps for others, while appearing innocent."

This exchange was something of a watershed moment. On October 20, Wood emailed Khaled and BCC'd several other individuals, including Russell and defendant Autumn Romig, a member of Radmoor's governing board. Wood warned Khaled that he had concerns "about our continued partnership going forward due to philosophical differences" because Khaled wanted Radmoor "to assert more control over the children and impose consequences/punishments on kids who have inappropriate interactions," but that "just isn't [Radmoor's] approach." Wood observed that Khaled's "refusal to acknowledge" that his own son "is not completely blameless" was "a major impedance to your success and our ability to support" Khaled's son. Wood said it was "inappropriate for [Khaled] to attack a 9-year old in this way" in response to Khaled's remarks about his son's classmate routinely lying and setting traps for others. According to Wood, Khaled's "language and tone are designed to villainize a 9-year old." He faulted Khaled for having "placed judgement on this child" and—informed by the prior experience with Khaled's presence at the school due to the dispute over masks—decided that he could "no longer allow [Khaled] to observe recess" because his son's classmate would be there and "[y]ou are targeting him and you don't have the right to observe him in what is designed to be a safe space."

Khaled did not receive Wood's email very well. In his October 24 response, he insisted Wood's message had been "written with the intention to intimidate" and was "presumptuous, fraught with contortions and gross misrepresentations, and downright rude." Khaled invoked "an intrinsic right to self-defense" which he "intend[ed] on continuing to exercise . . . to defend myself and my family." While acknowledging his son's role in the situation, he asserted that "[t]he elephant in the room is [his son's classmate] and his tactics, which have also taken the form of rallying others against [Khaled's son] to the point where he would feel isolated." He objected to Wood "attacking [Khaled] for being human and forming an impression of someone." And he flatly refused to comply with the ban on observing recess: "I do not respond well to intimidation or threats. Any attempt by you to prevent me from observing or having a picnic is deemed completely unacceptable and will be met with a lawsuit, plain and simple."

The promised confrontation came to pass the next day—although some facts are in dispute. What is undisputed is that Khaled came onto the school property. Russell testified at her deposition that Wood told the recess supervisors that Khaled was not allowed to observe recess. She also testified that Khaled was indeed seen watching the children on the playground. At his deposition, Khaled acknowledged that he understood Wood's email as saying "I can no longer observe recess." He acknowledged that he "was picnicking with my daughter." Defense counsel noted that he had previously gone to the picnic area to observe recess and asked whether that was what he was doing this time, and Khaled responded, "I wouldn't put it that way, no," although he acknowledged that he "could see recess."[2] Khaled ultimately conceded that he had violated what Wood had told him

---

[2] As an indication of how the Russell deposition went, when Russell testified that Khaled did this "24 hours after you had been asked not to do so," Khaled then asked some eight times how she could know this with certainty.

to do; when defense counsel observed that Khaled could have "followed Mr. Wood's directive," Khaled responded, "That would have been too humiliating to do, and I chose not to do it."

Khaled's arrival on the school property was the last straw for defendants. On October 24, Wood and Romig both signed a letter on behalf of Radmoor advising Khaled that his children were being expelled from the school. The letter noted that Khaled had failed to treat the school's staff with respect and had violated policies; "[f]or example, just today you observed recess despite being fully aware your permission to do so had been rescinded in writing on October 20, 2022." Defendant Tianna Dart is also a member of the school's governing board, and she had a subsequent text message exchange with two school parents who knew the Zakharias. When those parents inquired about what led the Zakharia family to leave the school, Dart responded, "I wish I could shed some light but I'm just not at liberty to legally." She also remarked that "[a]ll I can say is the decision was made with the well-being of the students, staff and school as a whole."

Plaintiffs filed suit against the school, Wood, Romig, and Russell.[3] Their complaint asserted counts of threat, breach of contract, intentional infliction of emotional distress (IIED), and defamation. The trial court ultimately granted summary disposition to defendants. It held that there was no genuine issue of material fact under MCR 2.116(C)(10) that Khaled had trespassed on school grounds by violating the directive of Wood not to observe recess. As to plaintiffs' threat and IIED claims, it granted summary disposition under MCR 2.116(C)(8) because plaintiffs had not pleaded facts that would support liability even if proven. It also granted summary disposition on plaintiffs' defamation claim under MCR 2.116(C)(10), concluding that the relevant communications were between school employees and were part of their job responsibilities, making them privileged; it also concluded that plaintiffs had not established that any of the statements were false.

Within days of the trial court dismissing plaintiffs' case, plaintiffs filed a new action against Radmoor and Dart. In it, they alleged that Dart's text exchange with Radmoor parents had defamed plaintiffs. They also alleged that an attorney for Radmoor, Brian McGorisk, had defamed them at a meeting with school staff to prepare them for upcoming depositions in the first case. At that meeting, McGorisk had allegedly characterized Khaled as saying "eff you" in his email exchange with Wood. Defendants moved for summary disposition, arguing that Dart had said nothing defamatory and that she enjoyed a qualified privilege inasmuch as it was her job to respond to parent inquiries. They further argued that McGorisk's remark could not be ascribed to Radmoor, and that it was simply a figure of speech made in jest during an attorney-client meeting. Defendants also asked for sanctions, arguing that the case was frivolous.

The trial court granted defendants' motion for summary disposition. It ruled that Dart's statement was true—indeed, plaintiffs conceded that it was true—and therefore could not be defamatory. It also said that McGorisk's remark was "not an actionable statement against" Radmoor, and it awarded defendants $500 in sanctions. Plaintiffs then moved to amend their complaint, asking to add McGorisk as a defendant. The trial court denied that motion and said

---

[3] The complaint initially also named plaintiffs' children as plaintiffs, but they were subsequently dismissed from the case.

-4-

that plaintiffs needed to bring a separate action against McGorisk. Plaintiffs moved for reconsideration, but the trial court denied that as well.

Plaintiffs filed claims of appeal from both trial court orders granting summary disposition. In Docket No. 369047, they appeal the trial court's order granting summary disposition to Radmoor, Wood, and Romig[4] regarding their breach of contract, IIED, and defamation claims. In Docket No. 372364, they appeal the trial court's order granting summary disposition to Radmoor and Dart on their additional defamation claims. The appeals were consolidated for administrative efficiency.

## II. ANALYSIS

As noted, plaintiffs raise over a dozen issues on appeal. Some are repetitive; others need not be addressed in light of our disposition. We have organized them somewhat differently than plaintiffs' presentation in their briefing.

## A. BREACH OF CONTRACT

Plaintiffs first argue that Radmoor breached its contract with them by expelling their children. We review questions of contract interpretation de novo. *Zwiker v Lake Superior State Univ*, 340 Mich App 448, 474; 986 NW2d 427 (2022). We also review a trial court's decision on a motion for summary disposition de novo. *Id*. at 473. The trial court granted summary disposition on plaintiff's breach-of-contract claim under MCR 2.116(C)(10). For such a motion, the court "considers the pleadings, admissions, and other evidence submitted by the parties in the light most favorable to the nonmoving party," after which "[s]ummary disposition is proper if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Id*. at 473-474.

Radmoor has a "Parent Handbook" that sets out the terms of its relationship with families attending the school. It expressly provides that student dismissal is a possible response for particularly aggravated forms of parental misconduct, and provides a nonexclusive list of qualifying behaviors:

> Montessori Radmoor School reserves the right to dismiss a child or children from school if the parent behaves inappropriately. Behaviors that are grounds for dismissal include, but are not limited to, the following:
>
> - Acts of violence, including assault and battery
>
> - Verbal abuse, harassment of, or threats against the staff, other parents or children
>
> - Possession of illegal substances or firearms

---

[4] Plaintiffs do not appear to challenge the trial court's grant of summary disposition to Russell.

- Verbal or physical abuse of any child

- Profanity

- Indecent exposure

- Trespassing in restricted areas without permission . . .

The trial court rejected plaintiffs' breach-of-contract claim because it held that plaintiff had been expressly told not to come on school grounds to observe recess, but he did so anyway. That was a trespass[5] in direct violation of the final item in the list of behaviors that are grounds for dismissal.

On appeal, plaintiffs argue that defendants acted capriciously in prohibiting Khaled from coming to the school to observe recess. This is not a relevant observation, however. The Parent Handbook expressly provides that trespassing is a form of major misconduct that warrants expulsion, and there is no dispute that Khaled violated a directive from Wood not to come to the school grounds to observe recess. He therefore was, by definition, trespassing, meaning that under the express terms of the Parent Handbook, he committed conduct that justified expulsion. Nor do the terms of the Parent Handbook make any commitment to consistency; irrespective of what other parents were allowed to do, Khaled was expressly prohibited from coming on school grounds to observe recess, but he did so anyway. Central to Khaled's argument is that the area from which he watched recess was not specifically listed in the Parent Handbook as a restricted area. In his view, he necessarily could not be trespassing if he was in a place not listed as a restricted area in the Handbook. But the Handbook cannot be read as making a commitment to the listed restricted areas being the only restricted areas that would ever exist. Wood restricted Khaled's access to the Radmoor property, a directive that Khaled disobeyed. That is a trespass. What is more, Khaled ignores that to the extent he had a contractual right to "observe" his children at school, the handbook expressly states that "[i]t is necessary to set up an appointment for observing." Not only did Khaled not set up an appointment to "observe" recess, he violated the express directive from Wood to not observe recess.

The parties especially dispute whether there is a zone of discretion that private schools enjoy in making disciplinary decisions. This is because the trial court explained its decision to grant summary disposition in part as because "the school reserved to itself and to the employees the right to take action with regard to conduct that fell within the school's discretion of . . . what constituted sufficient misbehavior by either children or parents." It is true that some other state courts have recognized a special prerogative of private schools to manage their affairs. See, e.g., *Allen v Casper*, 87 Ohio App 3d 338, 343-344; 622 NE2d 367 (1993) ("Because contracts for private education have unique qualities, they are to be construed in a manner which leaves the school board broad discretion to meet its educational and doctrinal responsibilities."). But because plaintiffs' conduct violated an objective provision in the Parent Handbook, we need not resolve

---

[5] A trespass is an unauthorized intrusion into land belonging to another. *Wolfenbarger v Wright*, 336 Mich App 1, 15; 969 NW2d 518 (2021).

whether that rule applies in Michigan.[6]  In the analogous circumstance of university education, this Court has applied the ordinary standards of contract interpretation to disputes over whether services have been properly rendered.  See, e.g., *Zwiker*, 340 Mich App at 474-480.  There is no dispute that Khaled violated Wood's directive not to continue coming to the school to observe recess; his conduct therefore is on the Parent Handbook's list of behaviors justifying expulsion. Radmoor did not breach its contract with plaintiffs.

## B.  DEFAMATION

Plaintiffs next argue that the trial court erred when it granted summary disposition on their defamation counts.  In Docket No. 369047, they argue that the trial court erred when it held that the allegedly defamatory statements made by Wood and Romig were only observations and opinions not capable of being defamatory without considering each allegedly defamatory statement in the light most favorable to plaintiffs.  Perhaps daunted by 25 separate statements, the trial court did not individually analyze each of them, which is necessary to grant summary disposition on this basis.  See *Sarkar v Doe*, 318 Mich App 156, 179; 897 NW2d 207 (2016).  That said, plaintiffs arguably invited that error, as in their trial court brief they said they only needed to "bring[] up a couple of examples that are easy to show that they were made with actual malice, because the context is all embedded within the email thread, and *does not require exploring past events or different contexts to ascertain that*."  In any event, any error was harmless.

The elements of a defamation claim are well-established:

> (1) a false and defamatory statement concerning the plaintiff, (2) an unprivileged communication to a third party, (3) fault amounting at least to negligence on the part of the publisher, and (4) either actionability of the statement irrespective of special harm (defamation per se) or the existence of special harm caused by publication.  [*Mitan v Campbell*, 474 Mich 21, 24; 706 NW2d 420 (2005).]

Some of these elements have further terms of art embedded in them.  Under the first element, "[a] communication is defamatory if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *Smith v Anonymous Joint Enterprise*, 487 Mich 102, 113; 793 NW2d 533 (2010) (citation omitted).  The first element also requires that "statements must assert facts that are provable as false," although "[e]ven statements couched in terms of opinion may often imply an assertion of objective fact and, thus, can be defamatory." *Ghanam v Does*, 303 Mich App 522, 545; 845 NW2d 128 (2014).  The second element requires unprivileged communications, and "[t]he elements of a qualified privilege are (1) good faith, (2) an interest to be upheld, (3) a statement limited in scope to this purpose, (4) a proper occasion, and (5) publication in a proper manner and to proper parties only." *Gonyea v Motor Parts Fed Credit Union*, 192 Mich App 74, 79; 480 NW2d 297 (1991).  A qualified privilege

---

[6] In contrast, *Allen* involved a dispute over the application of Bethlehem Christian School's requirement that parents of students "demonstrate a spirit of cooperation" and "register only necessary complaints with the appropriate teacher and/or administrator."  *Allen*, 87 Ohio App 3d at 340.

can only be overcome "by showing that the statement was made with actual malice, that is, knowledge of its falsity or reckless disregard of the truth." *Id*. Both whether a statement is capable of being defamatory, as well as whether actual malice exists, are questions of law. *Ghanam*, 303 Mich App at 542 n 11, 544.

The fundamental questions here are whether defendants' remarks were "false and defamatory" and "unprivileged communications." Plaintiffs concede that defendants enjoy a qualified privilege due to their shared interest in the management of the school. Because a qualified privilege can be overcome if the statement was made with actual malice—knowledge of its falsity or reckless disregard of the truth—we cannot escape examining the many remarks complained of by plaintiffs. Most of them are laid out in ¶ 190 of plaintiffs' complaint. For many, plaintiffs are simply not the subject of the remark:

> f. "After hearing your perspective on this child, I can no longer allow you to observe recess because [classmate] will be there." . . .

> \* \* \*

> h. "you don't have the right to observe him in what is designed to be a safe space." . . .

> j. "Holding him completely blameless has left this process in neutral."

> \* \* \*

> o. "It's important to understand that the school will not philosophically change or bend to your will." . . .

> \* \* \*

> p. "Adjustments you will need to make for a successful partnership with Radmoor: Respect for our staff . . . Follow the Child . . . Purposeful Policies . . . Respect for the Child . . ." . . .

> \* \* \*

> s. "Follow the Child - This is what we do and we need your support so that your children can be successful in this environment. Either you trust our process or you don't." . . .

> \* \* \*

> u. "You have been complaining about them for two years." . . .

> v. "If you would like to stay, you'll need to accept that we have policies and we enforce them." . . .

The subject of ¶ 190(f) is Wood; the subject of ¶ 190(h) is Khaled's rights or privileges; the subject of ¶ 190(j) is the process itself; the subject of ¶ 190(o) is the school; the subject of ¶ 190(p) is the school's requirements; the subject of ¶ 190(s) is the school's philosophy; and the subject of ¶ 190(v) is the school's policies. Although the subject of ¶ 190(u) at first glance appears to be Khaled, when considered in context, it is about Radmoor's policies because it is in a section labeled "Purposeful Policies" and follows a sentence regarding how Radmoor's policies had been thoughtfully designed. It does not state any facts about Khaled.

Several additional statements that plaintiffs allege are defamatory are matters of opinion. "[W]hen a speaker outlines the factual basis for his conclusion, his statement is protected by the First Amendment." *Sarkar*, 318 Mich App at 190. Many of Wood's statements expressly include those factual bases, which are italicized:

> b. "*Based on our conversations*, my understanding is that you would like us to assert more control over the children and impose consequences/punishments on kids who have inappropriate interactions." . . .

> * * *

> e. "*Your language and tone* are designed to [villainize] a 9-year old."

> * * *

> l. "*Your words and actions indicate* that [you] don't respect our policies or our staff."

> * * *

> q. " . . . there have been several disrespectful comments from you in regards to our staff. *You place judgements on them, suggest they are incompetent, and use demeaning language . . .*" . . .

> * * *

> r. "*The sum of your words and tone through the years* indicate that you do not respect our teaching staff."

> * * *

> t. "*Interference with their learning at school indicates* a lack of trust for what we are doing." . . .

Similarly, in ¶ 201, plaintiffs allege that the expulsion letter signed by Wood and Romig defames Khaled, but the statement again contains the factual basis for the conclusion: "*Your communications to the Head of School reflect* a lack of respect for our school's philosophy and the staff and Head of School's authority."

Three additional statements made by Wood do not contain the factual basis for the conclusion within the "four corners" of the statement, but a factual basis can reasonably be discerned from the overarching context.

> c. "Your refusal to acknowledge this fact is a major impedance to your success and our ability to support [Khaled's son]."

> * * *

> i. "You enable [Khaled's son] to not accept any responsibility for his role in this relationship."

> * * *

> m. "You often look to assign blame rather than just owning your mistake and moving on."

> n. "How can we have a relationship of trust if you are constantly pointing the finger at someone?" . . .

The first two conclusions unmistakably follow from Wood's remark that Khaled's son was "not completely blameless." The third and fourth immediately follow Wood's observation (quoted above) that Khaled did not "respect our policies or our staff," which is once again the factual basis for Wood's conclusion.

Two further conclusions are not capable of defamatory meaning because they are not provably true or false. Plaintiffs complain that Wood said, "Looking at this situation critically, there may be an inconsistency between your expectations as a parent and our approach as an AMI[7] school," as well as, "It doesn't sound like you're happy to comply with the policies, Khaled." ¶ 190(a), (k). The use of qualifiers—"there *may be* an inconsistency"; "*it doesn't sound like* you're happy"—"makes the purported asserted fact hardly provable." *Ghanam*, 303 Mich App at 548.

The remaining remarks plaintiffs complain of do not fall within any of these categories. They are susceptible of being proven true or false, are not supported by specific factual bases, and are about Khaled.

> d. "It is inappropriate for you to attack a 9-year old in this way." . . .

> * * *

> g. "You are targeting [the other student]."

> * * *

---

[7] An "AMI" school refers to a Montesorri school accredited by the Association Montessori Internationale.

w. "It is inappropriate for you to watch him, target him, make assumptions about him, and villainize him." . . .

A complained-of remark in the expulsion letter—"You have also refused to adhere to policies and direction from the Head of School"—is also in this category. Even these remarks, however, are not actionable. A qualified privilege can be overcome only if the plaintiff can prove actual malice. Plaintiffs here cannot. They simply have no evidence that defendants said these remarks out of anything but a sincere belief in their truth. Irrespective of whether Khaled actually did "attack," "target," or "villainize" the student he felt was bullying his son, no reasonable juror could conclude that Wood did not sincerely hold these views. Similarly, whether the summary of Khaled's relationship with school administration in the expulsion letter was correct or not, any reasonable juror would conclude that Wood and Romig sincerely believed this was a fair characterization of that past history.

In Docket No. 372364, plaintiffs allege that Dart defamed them when she said to parents:

a. "I can tell you that Joe (and the staff) have well-documented and supported cause for the expulsion."

b. "It was not a decision made in haste or sadly, without cause."

Given that we are affirming the trial court's rejection of plaintiffs' breach-of-contract claim, however, plaintiffs cannot show that these statements are false. "Because truth is an absolute defense to a defamation claim," *Porter v Royal Oak*, 214 Mich App 478, 486; 542 NW2d 905 (1995), it is factually correct that Wood had cause to expel Khaled's children.

In short, then, all of the remarks which plaintiffs allege defamed them are either not capable of defaming them, were not made with actual malice, or are simply true. The trial court did not err in granting summary disposition on the defamation counts in either case.

## C. ENTITY LIABILITY

Plaintiffs also challenge the trial court's determination that McGorisk's "eff you" remark at a meeting with staff cannot be attributed to Radmoor as an institution. Although not relied on by the trial court, we agree with defendants that this claim was barred by res judicata. Plaintiffs were informed about this statement on September 10, 2023, during the pendency of their first case against Radmoor. They filed an amended complaint on October 31, 2023, but did not bring this claim until filing a separate suit on December 18, 2023. Res judicata "bars a second, subsequent action when (1) the first action was decided on the merits, (2) the matter contested in the second action was or could have been resolved in the first, and (3) both actions involve the same parties or their privies." *King v Munro*, 329 Mich App 594, 601; 944 NW2d 198 (2019) (quotation marks and citation omitted). This situation certainly qualifies—the first action against Radmoor was decided on the merits, these claims could have been brought in that action, and both actions involve the same parties. The claim is therefore barred by res judicata.

## D. AMENDING THE COMPLAINT

Plaintiffs next argue that the trial court erred in refusing to allow them to amend their complaint in Docket No. 372364. After the trial court held that Radmoor could not be held liable for McGorisk's remarks, plaintiffs moved to amend their complaint to add McGorisk as a defendant, and the trial court refused. We review a trial court's decision to deny a motion to amend for an abuse of discretion. *Zwiker*, 340 Mich App at 474. While "[l]eave [to amend] shall be freely given when justice so requires," MCR 2.118(A), the addition of additional parties implicates the trial court's discretion to manage joinder of claims. In general, the court rules permit a plaintiff to join multiple defendants in a single action in two broad circumstances:

(a) if there is asserted against them jointly, severally, or in the alternative, a right to relief in respect of or arising out of the same transaction, occurrence, or series of transactions or occurrences and if a question of law or fact common to all of the defendants will arise in the action; or

(b) if their presence in the action will promote the convenient administration of justice. [MCR 2.206(A)(2).]

At the same time, "[p]arties may be added or dropped by order of the court on motion of a party . . . *on terms that are just*." MCR 2.207. Under *Zwiker*, this decision is reviewed for an abuse of discretion. We cannot say that the trial court abused its discretion in this regard. In *Kubiak v Hurr*, 143 Mich App 465, 477-478; 372 NW2d 341 (1985), this Court held that when a defamation claim is brought against both an individual and that individual's attorney, the proceedings should be severed. In particular, there is a risk that the attorney may be called as a witness in the action against the attorney, which "creates the danger of prejudice to both parties and confusion to the jury" if it sees an attorney acting "in both the advocacy and witness roles." *Id*. at 478. While *Kubiak* is not binding on us under MCR 7.215(J)(1) because it was issued before November 1, 1990, we need not decide whether to reaffirm it under MCR 7.215(B)(4). In light of the deferential standard of review, it is sufficient to note that the trial court did not abuse its discretion under MCR 2.207 when it denied plaintiffs' motion in light of *Kubiak*. See MCR 7.215(C)(2).

## E. IIED

Plaintiffs also contend that the trial court erred in granting summary disposition on their IIED claim. The trial court granted summary disposition on this claim under MCR 2.116(C)(8), which tests whether a claim is legally insufficient. Such a motion "tests the *legal sufficiency* of a claim based on the factual allegations in the complaint." *El-Khalil v Oakwood Healthcare, Inc*, 504 Mich 152, 159; 934 NW2d 665 (2019). The court "accept[s] all factual allegations as true, deciding the motion on the pleadings alone," and can only grant it "when a claim is so clearly unenforceable that no factual development could possibly justify recovery." *Id*. at 160.

The elements of an IIED claim are "(1) the defendant's extreme and outrageous conduct, (2) the defendant's intent or recklessness, (3) causation, and (4) the severe emotional distress of the plaintiff." *Lucas v Awaad*, 299 Mich App 345, 359; 830 NW2d 141 (2013) (citation omitted). "Extreme and outrageous" conduct under the first element is conduct "so outrageous in character,

and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." *Doe v Mills*, 212 Mich App 73, 91; 536 NW2d 824 (1995). It does not include "mere insults, indignities, threats, annoyances, petty oppressions, and other trivialities." *Id*.

Plaintiffs argue that the expulsion of their children meets this standard because, they say, it was done under "false pretenses." We disagree. First, it is simply incorrect to say the expulsion was under "false pretenses"; as we have established, Radmoor had cause to expel plaintiffs' children such that it was not breaching its contract with plaintiffs. Second, even if that were not the case, a dispute that ripens into the defendants severing their business relationship with plaintiffs is simply not "utterly intolerable in a civilized community." "There is no occasion for the law to intervene in every case where some one's feelings are hurt." *Roberts v Auto-Owners Ins Co*, 422 Mich 594, 603; 374 NW2d 905 (1985). Examples of actionable IIED have included secretly videorecording sexual activity with unwitting partners, *Lewis v LeGrow*, 258 Mich App 175, 197-198; 670 NW2d 675 (2003), and placing someone in the same holding cell as someone in whose murder trial she had served as a juror, *Johnson v Wayne Co*, 213 Mich App 143, 161-162; 540 NW2d 66 (1995). Plaintiffs' allegations are nowhere close to these in severity, and the trial court did not err in granting summary disposition.

## F. THREAT

Plaintiffs further challenge the trial court's grant of summary disposition to Wood on their claim against him of threat. Michigan law holds that "unlawful and malicious threats may by reason of their intended results become actionable." *Edwards v Grisham*, 339 Mich 531, 535; 64 NW2d 715 (1954). Plaintiffs argue that the trial court failed to construe the allegations under this count in the light most favorable to the plaintiffs. We need not decide whether this is a fair critique of the trial court's decision, because we have already determined that there was nothing "unlawful" about Wood's actions. Plaintiffs allege that Wood "threatened in no uncertain terms that plaintiff, Khaled Zakharia, had to change his attitude or face expulsion"; since defendants did not breach any contract with plaintiffs for expelling their children, any threat was necessarily not unlawful. We affirm the trial court's decision to grant summary disposition on this count.

## G. SANCTIONS

Finally, plaintiffs challenge the trial court's award of $500 in sanctions for filing a frivolous action. A claim is frivolous if "[t]he party's legal position was devoid of arguable legal merit." MCL 600.2591(3)(a)(*iii*). "A court must determine whether a claim or defense is frivolous on the basis of the circumstances at the time it was asserted." *Meisner Law Group, PC v Weston Downs Condo Ass'n*, 321 Mich App 702, 732; 909 NW2d 890 (2017). "A trial court's findings of fact, such as whether a party's position was frivolous, may not be set aside unless they are clearly erroneous." *Keinz v Keinz*, 290 Mich App 137, 141; 799 NW2d 576 (2010).

When granting summary disposition on plaintiffs' second case (against Radmoor and Dart), the trial court said that plaintiffs' "legal position was devoid of arguable legal merit," which was "the conclusion I draw here, given what I just ruled." What the trial court had "just ruled," however, was that plaintiffs' claim against Dart was barred under its previous holding that Radmoor had not breached its contract with plaintiffs—a holding the court acknowledged was

subject to appellate review and potential reversal. Since the status of plaintiffs' breach-of-contract claim against Radmoor was not final, the claim against Dart was not devoid of arguable merit at the time it was filed; indeed, were this Court reversing the trial court's holding on the breach-of-contract claim, we may have needed to reverse on this count as well, at least for further proceedings on remand. Similarly, the trial court dismissed the "eff you" claim against Radmoor because it said that the school could not be held liable for McGorisk's statement. But McGorisk's identity as the maker of the statement only came out during summary disposition motion practice, meaning plaintiffs could not have known about it at the time they filed suit against Radmoor.[8] We conclude that the trial court's finding of frivolousness was clearly erroneous.

The trial court's grant of summary disposition to defendants in both Docket No. 369047 and Docket No. 372364 is affirmed. Its award of $500 in sanctions, however, is reversed.

/s/ Brock A. Swartzle
/s/ Matthew S. Ackerman
/s/ Christopher M. Trebilcock

---

[8] Taken literally, the trial court's decision to award sanctions was predicated on nothing more than "what I just ruled," which could be read to imply that because the court ruled against plaintiffs, their claims were frivolous. That would violate the principle that "[n]ot every error in legal analysis constitutes a frivolous position." *Kitchen v Kitchen*, 465 Mich 654, 663; 641 NW2d 245 (2002).